SCHNUCK MARKETS, INC., *et al.*, Plaintiffs and Counterdefendants-Appellants, v. DONALD G. SOFFER *et al.*, Defendants and Counterplaintiffs-Appellees.

Fifth District No. 5—90—0452

Opinion filed May 15, 1991.—Rehearing denied June 13, 1991.

W. Richard McGovern and Patrick M. Flynn, both of Jennings, Flynn &
Guymon, of Belleville, for appellant Central Bank.

Jack Humes, Jr., of Burroughs, Simpson, Hepler, Broom & MacDonald, of Edwardsville, and William J. Travis and Tracy L. Templeton, both of Greensfelder, Hemker & Gale, P.C., of St. Louis, Missouri, for appellant Schnuck Markets, Inc.

Leo H. Konzen and Edward C. Fitzhenry, both of Lueders, Robertson & Konzen, of Granite City, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

This cause comes on appeal from the circuit court's denial of the request by plaintiffs, Schnuck Markets, Inc. (Schnuck), and Central Bank, for permanent injunction and granting of the request by defendants, Donald G. Soffer (Soffer), Magna Trust Company (Magna) and Shop 'N Save Warehouse Foods, Inc. (Shop 'N Save), for a declaratory judgment allowing the defendants to relocate a sanitary sewer easement. The plaintiff Schnuck filed its initial complaint on August 16, 1989. In this first complaint, Schnuck alleged that the defendants Soffer, Magna, and Central Bank (Schnuck's landlord and subsequently a coplaintiff) had violated Schnuck's easement rights as a tenant of Central Bank. In particular, Schnuck alleged that the defendants had begun construction of a permanent structure which infringed upon Schnuck's reciprocal easement for parking, ingress, and egress between Soffer and Magna's property and Central Bank's property and upon Schnuck's sanitary sewer easement. Also in the first complaint, Schnuck alleged that its right to quiet enjoyment under its lease with Central Bank had been violated by Central Bank's failure to enforce these easements against Soffer and Magna. Therefore, Schnuck asked the court to issue a temporary restraining order enjoining Soffer and Magna from proceeding with its construction, to issue a preliminary and permanent injunction against Soffer and Magna, to grant Schnuck damages for interference with its easement rights, to grant Schnuck reasonable attorney fees and costs, and to award Schnuck reasonable attorney fees and costs against Central Bank for having to employ counsel to pursue this action. Schnuck's request for a temporary restraining order against Soffer and Magna was granted on August 16, 1989. In the defendants' answer to Schnuck's complaint for a preliminary and permanent injunction, the affirmative defenses of abandonment, waiver, or termination; estoppel; and unclean hands were raised.

On September 15, 1989, a hearing was held on Schnuck's request for the preliminary injunction, which the court denied at the close of

the plaintiff's evidence. Schnuck appealed this order, but, since the parties continued to pursue the permanent injunction, the appeal was dismissed pending the outcome of the circuit court's ruling on this issue. Subsequently, on December 20, 1989, with leave of court, Schnuck filed its first amended complaint. In this complaint, Schnuck alleged the same violation of its easement rights but added Shop 'N Save as a defendant to the cause of action. On February 21, 1990, Schnuck filed a second amended complaint in which it alleged that defendants Soffer, Magna, and Shop 'N Save had violated its easement rights. In addition, the second amended complaint realigned Central Bank, Schnuck's landlord, as a party plaintiff, and the second count of the second amended complaint alleged that the defendants' construction constituted a trespass as the structure was being partially erected on Central Bank's property.

On March 2, 1990, the defendants filed their answer to the second amended complaint, and, in their answer, the affirmative defenses of estoppel and unclean hands were raised. The defendants also filed a counterclaim with their answer, and in the counterclaim, the defendants alleged that Central Bank had recently commenced construction on Central Bank's property, which construction violated the defendants' rights under the reciprocal parking and traffic easements. In the second count of the defendants' counterclaim, the defendants sought a declaratory judgment as to whether the intent of the parties to the easements was to preclude the expansion of the existing buildings or to prohibit the relocation of the sanitary sewer and asked the court to exercise its equitable powers and permit the defendants to build over the easement or to relocate the sanitary sewer easement at the defendants' expense.

Hearings on the plaintiffs' second amended complaint and the defendants' counterclaims were held on March 13, 1990, and on April 2, 1990. At the close of the evidence, the court denied the plaintiffs' request for the permanent injunction and granted the defendants' request to relocate the sanitary sewer easement at the defendants' expense. It is from this order that the plaintiffs appeal. Before considering the plaintiffs' issues, a statement of the facts is necessary.

In 1957, the Lueders family owned two adjacent parcels of real estate which they decided to develop into a shopping center. On the smaller of the two parcels, known as Outlot 1, Lueders Addition (Outlot 1), a store was constructed and leased to Kroger Company (Kroger). Outlot 1 was held in a partnership by members of the Lueders family, which was known as Lueders, Inc. Subsequently, in 1962, the larger parcel of land, known as Nameoki Village Shopping Center

(NVSC), was developed by the construction of several buildings. Sometime prior to the development of NVSC, this property was placed in a land trust, and Granite City Trust and Savings Bank (NVSC's trustee prior to Central Bank) became the trustee and the legal title holder of this property with the Lueders family as the beneficial owners of the trust. The basic outline of the area is demonstrated in the following drawing.

In 1964, although the two parcels of property were in essence owned by members of the Lueders family, a declaration of easement was drawn up and duly recorded. In this easement, dated July 15, 1964, the owners of the two parcels of property gave to each other a reciprocal easement which granted each the "right to use the exits, entrances and the parking areas created and to be created" on both parcels of land (hereinafter referred to as the parking easement). In 1965, the declaration of easement of July 1964 was amended to exclude certain portions of each of the parcels from the easement so that the owners could expand the development of the parcels without violating the 1964 declaration of easement. The portions of the properties excluded from the easement by this amendment are not in issue

in this appeal. The amendment to the reciprocal easements was likewise duly recorded.

In 1978, again while the parcels were held in essentially common ownership, two other easements were granted. The one easement was a sanitary sewer easement granted by Lueders, Inc., in which Granite City Trust and Savings Bank was given the perpetual right and easement "to install, maintain, repair, remove and relocate a Sanitary sewer" on Outlot 1. The grantor of this easement (Lueders, Inc.) also agreed in this document to the following:

> "The Grantor herein reserves the right to use said land across which said easement is granted for any purpose not inconsistent with said easement, including the right to pave said surface for parking of vehicles, but Grantor agrees that it shall not permit other permanent structures upon said easement right-of-way."

The other easement entered into at the same time as the sanitary sewer easement was a water main easement in which Granite City Trust and Savings Bank (the grantor) granted Lueders, Inc., an easement on its property. The water main easement contained the same language as the sanitary sewer easement. Although these easements were executed and recorded in 1978, both the water main and the sanitary sewer had been in existence since around 1961, when the shopping center was first developed.

At some time prior to 1984, Central Bank became the successor trustee of the NVSC property. In 1984, the beneficial interest in the trust containing the NVSC property was sold to Dr. Ahmad and his wife. In 1986, Lueders, Inc., sold Outlot 1 to Magna, the trustee of the land trust of which Soffer was the sole beneficial owner.

In 1985, Kroger, which was leasing the building on Outlot 1, moved out of that building (the old Kroger store) and moved into a building on the NVSC property (the new Kroger store and, subsequently, the Schnuck's store). Although Kroger moved out of the premises on Outlot 1, its lease did not expire until 1989. In 1986, Kroger assigned its lease of the new Kroger store on the NVSC premises to Schnuck.

In 1987, Shop 'N Save, a competitor of Schnuck, expressed an interest in purchasing or leasing the old Kroger store on Outlot 1 from Soffer. However, due to litigation between Kroger and Soffer over the remaining lease of this property, nothing came of these negotiations. In 1989, after the Kroger litigation had been finalized, Shop 'N Save again sought to purchase Outlot 1 from Soffer. Soffer agreed to sell the property; however, before the sale had been closed, Soffer gave

Shop 'N Save permission to construct an addition onto the front of the old Kroger store. It is this construction which the plaintiffs allege infringes upon their easement rights under the parking easement and the sanitary sewer easement.

In addition to the foregoing background information provided to the court, the testimony presented before the court at the hearings on the plaintiffs' request for a permanent injunction and claim of trespass and the defendants' counterclaim for the relocation of the sanitary sewer easement was as follows: Diane Davis testified that she had been employed by Schnuck since January 1988 as a real estate administrator. In her capacity of real estate administrator, Davis manages Schnuck's properties, including the site on NVSC's property. However, she is not a day-to-day manager, and she keeps track of the property by looking at site plans and pictures she has on file.

Davis stated that Schnuck was assigned the current lease to the NVSC premises by Kroger. In front of the Schnuck's store, there are parking spaces for Schnuck's use. In addition, there are parking spaces in front of the old Kroger store on Outlot 1. According to Davis, there was no restriction between the two parking areas and traffic flowed freely between the two parking lots before the defendants' construction. Although the old Kroger store had been vacant since she had worked for Schnuck, the parking area in front of the old Kroger store had been used by the customers of SuperX Drugs, a co-tenant of Schnuck located on NVSC's property.

Davis testified that she is familiar with parking lots and traffic flow in shopping centers as she manages 39 other shopping centers. She had been familiar with the parking lots and the traffic flow for the Schnuck's store on NVSC's property since January 1988. In 1989, Davis was advised of Shop 'N Save's construction by a telephone call from Jack Chor, the manager of NVSC for Central Bank. Following Chor's telephone call and on another subsequent occasion, Davis went to NVSC, where she observed that a portion of the drive lane and the parking lot in front of the old Kroger store had been excavated. Additionally, footings and steel girders had also been erected in the former drive lane in front of the old Kroger store. In her opinion, if the thoroughfare of the driveway has been displaced and been moved outward from the old Kroger building, this creates traffic problems with circulation and displaces and eliminates existing parking spaces. In addition, the new footings and the steel girders formed a barrier in the driveway.

Davis sent Soffer a letter in August 1989 in which she advised Soffer that the construction taking place on his land violated

Schnuck's easement rights. Soffer did not respond to her letter. To her knowledge, neither Soffer nor Shop 'N Save had requested permission from Schnuck to build on or to excavate the parking lot in front of the old Kroger store. It was Davis' testimony that Schnuck had not objected to Shop 'N Save leasing the old Kroger store premises, but Schnuck's concern was the effect the construction would have on Schnuck's parking.

On cross-examination, Davis admitted that the legal description of NVSC's property did not include the old Kroger store, and that the land trust owning the old Kroger store was not a party to Schnuck's lease with Central Bank. In the lease executed between Schnuck and Central Bank, the only reference to the sanitary sewer easement was a general reference regarding the use of utilities. Davis further admitted that a plot plan of the parking spaces and the traffic flow was attached to Schnuck's lease with NVSC, but that the traffic flow and parking areas reflected on the plot plan were confined to the property owned by Central Bank, and that the area in front of the old Kroger store had no traffic pattern or parking scheme reflected on the plot plan. Davis testified that the old Kroger store had been vacant during her tenure with Schnuck, and, on her visits to the site, she had observed that the vehicular traffic goes across the parking lot in front of the old Kroger store in any direction. Also in Schnuck's lease, the agreement provided that 526 parking spaces were available for Schnuck's use, but these parking spaces were exclusive of the parking spaces on Outlot 1.

William Kankolenski, a registered land surveyor for Bax Engineering Company (Bax), testified on behalf of the plaintiffs. In 1985, Bax did a survey of Outlot 1 for Kroger to show the boundaries of the NVSC property. The 1985 survey was updated in 1989 by Kankolenski, at plaintiffs' attorney's request. The purpose of Kankolenski's survey was to locate the area where the asphalt pavement had been excavated for the construction of the new addition on the old Kroger store. Kankolenski did another survey update in February 1990, at which time he checked the parking lines on Outlot 1. To complete the survey updates in 1989 and 1990, Kankolenski reviewed Shop 'N Save's construction drawings, reviewed the survey done by Corlew and Associates in 1987, and visited the site of the survey. From these various sources, Kankolenski determined that the new addition extended 43 feet out from the front of the old Kroger building. When an 18-foot drive lane is added to the front of the new construction, approximately 42 parking spaces are eliminated in front of the old Kroger store. Kankolenski admitted that he made certain assumptions in

order to arrive at that figure as the parking lines were not always visible when he made his site check. Kankolenski explained that a city ordinance requires a 24-foot-wide drive lane in front of a building, and, if this width of drive lane is installed in front of the new addition, approximately 62 parking spaces rather than 42 parking spaces are eliminated. In addition, Kankolenski testified that the new addition on the old Kroger store extends onto the Central Bank's property about 10 feet. Kankolenski's testimony established that the new addition on the old Kroger store would be a permanent structure.

On cross-examination, Kankolenski stated that approximately 175 feet of the sanitary sewer is under permanent structures on Central Bank's property. According to Kankolenski, it is preferable to relocate sanitary sewers rather than to build over them, and that relocation of a sanitary sewer is a relatively easy task.

George Edwards testified that he is a title examiner and attorney for Midwest Title Insurance Company. His testimony established that a title commitment was done by his company on Outlot 1 in 1987 and again in 1989. The title search in 1989 was done for Wetterau, Inc., Shop 'N Save's parent corporation. Both the 1987 and 1989 title commitments reflected the parking easement and the sanitary sewer easement.

Dan Byrd, Schnuck's store manager of the NVSC store, testified that he had managed this particular store for Schnuck for 3½ years, but that he had managed Schnuck's former store in Granite City, with the exception of about five months, since 1980. Byrd was familiar with the old Kroger store since 1980. He testified that there was a canopy which covered the sidewalk in front of the old Kroger store, that a drive lane was in front of this, and beyond the drive lane was a striped parking area. His customers drive across Outlot 1 to get to Schnuck's store.

In 1989, construction began on the addition of the old Kroger store. The construction caused the drive lane to be excavated. Byrd stated that no one consulted him about the construction, and he was not given notice that the construction was to begin. According to Byrd, the new construction prevented people from driving across the drive lane in front of the old Kroger store. Byrd stated that the customers previously had "a straight shot coming through the drive lane and the shopping center and go out the south end. Now you have to make the jog and with the pharmacy, the Gasens [now SuperX Drugs] pharmacy, it is very difficult and dangerous to be through [sic] there now." Byrd testified that the parking in front of Schnuck's store is "super crowded" on weekends and holidays. In Byrd's opinion, the

new addition on the old Kroger store will affect parking for Schnuck's store as "there will be an overflow in parking."

Byrd admitted on cross-examination that the traffic can still cross over Outlot 1 to NVSC. He further admitted that there were no designated traffic lanes or parking spaces on Outlot 1. Byrd stated that in 1980, a new front was constructed on the new Kroger store on the NVSC property, but he did not know of any changes in the parking scheme on NVSC since 1980.

Robert Bruner testified that he is the director of store engineering for Shop 'N Save. Bruner explained that in late 1988 and early 1989, he met with Soffer to discuss the purchase of the old Kroger store. Bruner indicated to Soffer that Shop 'N Save wanted to expand the size of the store. Soffer did not tell Bruner about the parking lot easement or the sanitary sewer easement affecting the proposed expansion. The proposed expansion by Shop 'N Save extends 56 feet from the old construction and goes over the existing drive lane and some parking spaces. In addition to the new construction, the plans included an 18-foot drive lane in front of the store.

Prior to commencing construction of the new addition, Bruner did not inspect the property to see if the proposed construction would be on the neighboring property. Bruner admitted that the excavation work and four footings are on Central Bank's property. Bruner further admitted the new addition would be a permanent structure.

Bruner testified that the initial excavation undertaken by Shop 'N Save was to repair the water line which had broken. It was thought that the sprinkler system for the entire shopping center was damaged, which prompted Shop 'N Save to excavate and repair the leak. After excavation had begun, but before construction of the new addition had commenced, Bruner had two conversations with Jack Chor, manager of the adjacent property. In his first conversation with Chor, Chor did not tell Bruner he was trespassing, but Chor did ask Bruner if he was aware of any lease agreements which would have an effect on parking or sewer easements. Bruner told Chor he was unaware of this. Bruner indicated to Chor that he desired to move the sewer line and told him where he wished to place a manhole. Chor stated this was on Central Bank's property and that "there might be some money involved in that." Bruner told Chor that they would have to discuss this further.

At Bruner's second meeting with Chor in June 1989, Mark Wetterau was also present. At this meeting, Bruner told Chor of Shop 'N Save's plans and gave Chor the proposed floor plan. Chor did not tell Shop 'N Save that it should stop the construction. Chor indicated that

he would clear up any problems, and that he would take care of "whatever had to be done." Chor again brought up that there would be a "charge of some sort," but no money amounts were discussed.

Bruner testified that the concrete sidewalk and the brick pillars and the footings of the pillars for the canopy over the sidewalk of the existing old Kroger store extended out over the sanitary sewer easement. Bruner stated that if it were necessary to repair the sanitary sewer, the sidewalk would have to be dug up. When Shop 'N Save excavated the sanitary sewer and relocated a manhole, it was discovered that the sanitary sewer had collapsed in one area in front of the old Kroger store. Bruner explained that the top part of the sewer had collapsed from age, from the burden of the sidewalk overlaying it, and from the concrete construction of the sewer. Shop 'N Save replaced the old sewer line with PVC 40, which meets the codes for sewers with permanent structures over them. Bruner stated that after this lawsuit was filed, the expansion was redesigned. Bruner was not aware of anyone giving him permission to move the sewer line.

Matthew McCarthy, called as an adverse witness by the plaintiffs, testified that he was general counsel for Wetterau, Inc. Because Shop 'N Save is one of Wetterau's subsidiaries, he also does work for it. He was aware that Shop 'N Save became interested in purchasing Outlot 1 in 1987. He drafted a purchase agreement letter which expired because Soffer was unable to obtain a cancellation agreement from Kroger regarding Kroger's lease. Soffer did not discuss the parking lot and sanitary sewer easements during their discussions in 1987; however, Shop 'N Save obtained a title commitment to Outlot 1 in 1987. The title commitment indicated the easements to which the property was subject. Shop 'N Save renewed its interest in purchasing Outlot 1 in 1989, at which time an updated title commitment was received. The updated title commitment likewise contained references to the easements. McCarthy admitted that he did not acquire permission to build upon the easements and he did not know if anyone else had done so.

Prior to construction of the new addition on the old Kroger store, McCarthy reviewed the sanitary sewer easement. He admitted he was aware that the new addition would be a permanent structure on the easement. He became aware that the new addition was also encroaching upon the neighboring property sometime in August 1989. Although Shop 'N Save had not closed on the contract to purchase Outlot 1, Soffer gave him oral permission to begin the construction of the new addition. In October 1989, Shop 'N Save received a letter from plaintiffs' counsel wherein plaintiffs objected to the construction. It

was McCarthy's opinion that the new construction on the old Kroger building did not constitute a barrier between Central Bank's property and Outlot 1. McCarthy testified to numerous constructions being built since the parking easement was granted in 1964 and amended in 1965. He noted that the cinema and Wendy's had been built on the parking lot of Central Bank's property, and that these structures changed the flow of traffic.

Jack Chor testified that he was employed by Capital Coordination Company, an insurance and property management business. He stated he had managed the NVSC property for Central Bank since 1984, when the land trust beneficiaries changed to the Ahmads. Other than a canopy built over the new Kroger store in 1985, Chor was unaware of any new construction since 1984, until Shop 'N Save began construction on Outlot 1. Chor corroborated Byrd's testimony that there was a sidewalk with a canopy over it in front of the old Kroger store, but Chor could not recall a parking scheme for that area.

Chor testified that he was not contacted prior to the construction for permission to construct or to notify him of the construction. Chor found out about the new construction through his maintenance man, Mr. Stein. After being advised of the new construction, Chor called the construction company, whereupon he was referred to Bruner at Shop 'N Save. Chor testified that he and Bruner met and Chor pointed out to Bruner the boundaries of Central Bank's property and showed Bruner that Shop 'N Save's construction extended onto Central Bank's property. Chor told Bruner that the construction was blocking the flow of traffic and appeared to be a violation of the parking cross-easements.

Bruner called Chor to arrange a second meeting. Wetterau participated in this meeting, and Chor stated that he hand-delivered a letter telling Shop 'N Save about the easement violations at the meeting. Chor did not give Shop 'N Save permission to construct on the parking easement. Chor admitted that he was unaware of the sanitary sewer easement at the second meeting, but that he became aware of this easement at a subsequent date.

On cross-examination, Chor testified that Central Bank was not an original plaintiff to this suit. He explained that Central Bank became a plaintiff as a result of a settlement agreement between Central Bank and Schnuck involving a dispute over common area maintenance charges. Before Central Bank became a plaintiff, the bank did not oppose enforcement of the easements, but since Schnuck filed suit first, the bank decided to let Schnuck prosecute the claim. Chor further admitted that discussion of compensation for building upon Cen-

tral Bank's land may have been initiated by him at his meeting with Bruner and Wetterau. Chor testified that, due to changes made on Central Bank's property, nine parking spaces had been eliminated. Chor also stated that the Kroger lease entitled Schnuck to 526 parking spaces, but when he recently counted the available parking spaces, only 496 were available. Chor admitted that the number of parking spaces and the configuration of the parking today was different than that presented in 1983; however, up until 1984, Chor did not think permission to change the parking spaces and the traffic flow was needed as Henderson owned and managed both Central Bank's property and Outlot 1.

Chor testified that Central Bank had hoped to purchase the old Kroger store in order to work out an arrangement with Shop 'N Save. The bank had done a market study of supermarkets and had determined that Shop 'N Save would be the next supermarket to expand its facility.

Chor explained that other tenants besides Schnuck were served by the sanitary sewer easement, but that the other tenants were not parties to this suit. Chor explained that Outlot 1 has no sanitary sewer easement on Central Bank's property. According to Chor, neither he nor the owner of NVSC had given permission to the defendants to build over the sanitary sewer easement or over the parking easement.

Donald Soffer, called by the plaintiffs as an adverse witness, testified that he is a real estate investor and that he is the beneficial owner of the land trust which owns Outlot 1. He purchased Outlot 1 in December 1986, at which time the old Kroger store was vacant. Before buying Outlot 1, he obtained a title commitment, and the title commitment revealed the existence of the easements which are the subject of this lawsuit. Soffer corroborated the testimony that he did not point out the easements to Shop 'N Save during their purchase discussions; however, Soffer had given Shop 'N Save a copy of his title commitment. Soffer explained that a closing date for the sale of Outlot 1 to Shop 'N Save had not yet been set, but that he had given Shop 'N Save permission to make improvements upon the old Kroger store. Soffer did not give Shop 'N Save permission to build upon Central Bank's property.

Counsel for Central Bank and the Ahmads stipulated that neither the bank nor the Ahmads would consent to the relocation of the sanitary sewer easement, and they also would not permit Shop 'N Save to build over this easement.

The defendants called Mark Schnuck (Mark) as an adverse witness. He testified that he is vice-president of shopping center development for Schnuck. Mark stated that Schnuck moved into the new Kroger building in 1986, and the reason for the move was that the new Kroger store was a bigger facility. Because of increasing competition with National, a bigger facility was needed so that Schnuck could offer more to its customers. Mark admitted that the parking at the new Kroger store was less desirable than the parking available at their store's old location.

The defendants advised the court that they intended to call Philip Corlew as a witness. The plaintiffs objected on the grounds that Corlew was to be called as an expert witness, and they had not been timely advised that Corlew was to testify. After some discussion, plaintiffs said they would not object to Corlew's testimony if they were given time to interview him prior to his testimony, which request the court granted. After interviewing Corlew, the plaintiffs stated they did not object to Corlew's testimony regarding the relocation of the sanitary sewer easement; however, the plaintiffs renewed their objection to his testimony which would go beyond the relocation. The court allowed Corlew to testify over the plaintiffs' objection.

Philip Corlew testified that he is a registered professional engineer and a registered land surveyor. He stated he was familiar with the parcels of property involved in this lawsuit. In 1972, his firm did a topographic map of the NVSC property and Outlot 1. When he did this survey, the sanitary sewer was not covered by a building, but the covered walkway in front of the old Kroger building was over the sanitary sewer. His firm did another survey in 1984 of the two parcels of property. This survey revealed that the old Kroger store had been extended to the south and that the Bonanza building had been constructed. The new Bonanza building had been built over the sanitary sewer on NVSC's property. The sanitary sewer was also in a slightly different location than it was in 1972, although the relocation was not outside the 10-foot-wide easement granted.

A third survey was done in June 1987 for the purpose of determining the parking area in front of the old Kroger store. In 1989, a fourth survey was done by his firm, at Jack Chor's request, to locate the expansion in front of the old Kroger store being done by Shop 'N Save. The 1989 survey also revealed that the sanitary sewer had been extended southward in front of the old Kroger store since 1984.

Corlew had done an engineering study for the defendants regarding the relocation of the sanitary sewer. He found that the elevation was sufficient to relocate the sewer, and he determined that there

were two ways to relocate the sewer to keep it from being under the new addition to the old Kroger store. The first relocation discussed would cost $11,652, while the second possible relocation would cost $10,464. Corlew testified that it was feasible to build over the sewer, but he did not recommend this be done. In his opinion, it would be better to relocate the sewer.

Corlew determined that the new addition on the old Kroger store extended 56 feet. Additionally, if it is presumed that a drive lane will be placed in front of the new addition, this extends the area another 24 feet. In Corlew's estimation, approximately 43 feet of parking will be lost by the new addition and the drive lane.

Corlew testified that the current parking lot in front of the old Kroger store was in poor shape. When asked if the new addition forms a barrier to traffic, Corlew responded that if the existing lane in front of the old Kroger store and the adjacent SuperX Drug store was for driving through, then the addition forms a barrier. However, if the lane was used for parking, this would present a different situation.

James Henderson testified that he helped develop the shopping center on NVSC's property and on Outlot 1. The owners of the two properties at the time of the development were Conrad Lueders, Wesley Lueders, and Henry Lueders. He stated that he is Henry Lueders' son-in-law. According to Henderson, Outlot 1 was developed first by the construction of the old Kroger store in 1957. The NVSC property was developed in 1962 or 1963. At the time of the development of NVSC, Henry Lueders, Wesley Lueders' widow and Henderson were the owners of the property. The lead store on the NVSC property was a W.T. Grant store (subsequently the new Kroger store and then the Schnuck's store).

According to Henderson, in 1964, the cross-easements for parking, entrances, and exits were entered into, but this document was subsequently amended in 1965. Since the declaration of easement in 1964, nine changes had occurred in the shopping center. In 1972, the cinema was built; in 1973, Bonanza was built; in 1974, the cleaners was added; and in 1978, Wendy's was constructed as part of the changes. While there was common ownership when some of the changes were made, at least three changes occurred after Dr. Ahmad had become the beneficial owner of the land trust holding title to NVSC. Whenever these changes were made, parking spaces were removed or changed, but the easement was not amended upon the occurrence of any of the changes. It was not Henderson's understanding that when these changes were made the cross-easements had to be

amended also. In Henderson's opinion, the language "to be created" used in the cross-easements provided flexibility to develop the shopping center without needing to amend the cross-easements. To Henderson, this flexibility meant that additional buildings could be built for new tenants and that different patterns of parking and traffic could develop, as they had over the decades.

Henderson testified that the sanitary sewer easement was prepared at his request in 1978, although the sewer itself had been in existence since 1957. The reason for the sewer easement was not due to a change in the location of the sewer. Henderson corroborated that the sewer ran under the sidewalk and canopy of the old Kroger store. Henderson admitted that the easement restricted the building of permanent improvements over the sewer; however, the reason he had that language inserted in the easement was to provide him with the opportunity to relocate the sewer if new construction was done and to enable him to not have the sewer under a building for purposes of maintenance, for to do so would be expensive. In Henderson's opinion, the language of the easement did not state either way whether the sewer could not be moved.

Lastly, A. James Duban testified that he is vice-president for retail development for Wetterau, Inc. He stated that he was familiar with the development of the old Kroger store by Shop 'N Save. Based upon his development of other shopping centers, in his opinion, it would be acceptable for the traffic to flow in front of the new addition to the old Kroger store and into the parking lot of NVSC. According to Duban's calculations, the parking ratio for Schnuck's store and for Shop 'N Save is 4 to 1, *i.e.*, 4 spaces to 1,000 square feet of the building. In his estimation, the ideal ratio is 4 or 6 parking spaces per 1,000 square feet of store space. Duban testified that Schnuck's parking was shared parking with Bonanza and other retail stores, while Shop 'N Save was noncompetitive parking. Duban admitted that if the new addition were not done, there would be more parking spaces available.

Following the hearings, the court allowed the parties to file post-trial memorandums and written arguments. Subsequently, the court entered a written order on June 4, 1990. In the court's order, the court found that the defendants had encroached upon the plaintiff Central Bank's property, and that the encroachment must be removed and the area repaired, but that the issue of damages for the trespass was reserved pending further order of the court. The court further found, with regard to the parking easement, that the parking had been altered throughout the years and that the traffic flow had been

modified several times. Additionally, the court determined there had never been an established pattern for parking in these areas. The court found that Henderson's testimony with reference to the language of the parking easement established that the intent of the parties at the time of the granting of the parking easement was to create flexibility in developing the shopping center, and that the new addition of Shop 'N Save was in accord with this flexibility. The court also found that there was no evidence that the remaining parking was inadequate.

With regard to the violation of the plaintiffs' sanitary sewer easement, the court found that the plaintiffs had constructed permanent improvements over the sewer. The court also determined that the evidence demonstrated that the sewer could be easily relocated. The court found that the equities were with the defendants, as the facts established that Schnuck was more concerned with hindering competition from Shop 'N Save "rather than with enforcing long-ignored easements." Therefore, the court denied the plaintiffs' request for the injunctive relief and allowed the defendants' counterclaim for relocation of the sanitary sewer, at the defendants' expense. Following a motion by the plaintiffs and an order of court finding there was no just reason to delay enforcement or appeal of this cause, a timely notice of appeal was filed by the plaintiffs.

On appeal, the plaintiffs raise numerous issues. The plaintiffs contend that the circuit court erred in refusing to enforce the sanitary sewer easement; that the court erred in refusing to enjoin the defendants' interference with the reciprocal parking easements; that the court erred in allowing testimony concerning settlement negotiations and in denying the plaintiffs' motion to strike references to these negotiations in the defendants' counterclaim and answer; that the court abused its discretion in allowing Philip Corlew to testify as an expert witness when Corlew had not been disclosed pursuant to the supreme court rules; that the court erred in denying the plaintiffs' motion to dismiss the defendants' counterclaim for a declaratory judgment; and that the court abused its discretion in denying the plaintiffs' motion for continuance.

We initially address the plaintiffs' contention that the court erred in not enforcing the sanitary sewer easement, or, in other words, the court abused its discretion in denying the plaintiffs' request for injunctive relief. Under this issue, the plaintiffs have raised six subissues. The plaintiffs contend that the court erred in not enforcing the sanitary sewer easement as (1) the plain language of the easement prohibited Shop 'N Save from building the new addition; (2) the

court's refusal to enforce the easement on the basis of waiver, estoppel, or abandonment was erroneous; (3) the court could not relocate the sanitary sewer easement without the consent of Central Bank; (4) the court could not balance the equities where the defendants had prior knowledge of the easement; (5) the doctrine of unclean hands was inapplicable; and (6) the court erroneously admitted parol evidence to vary the terms of the easement.

■ An easement is a right or privilege in the land of another, and, if it is exercised in connection with occupancy of other land, it is appurtenant thereto. (*Beloit Foundry Co. v. Ryan* (1963), 28 Ill. 2d 379, 192 N.E.2d 384.) An easement appurtenant passes by the conveyance of land to which it is annexed, and an easement appurtenant continues until the easement is either terminated or abandoned. (*Beloit Foundry Co.*, 28 Ill. 2d 379, 192 N.E.2d 384.) Where an easement is created by an instrument, the document must be construed in accordance with the intent of the parties, and such intention is ascertained from the words of the instrument and the circumstances contemporaneous with the creation of the easement. (*Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 414 N.E.2d 865.) Additionally, "[t]he use to which an easement is devoted or for which it is granted determines its character and to the extent for which it is necessary to carry out the purpose of the grant, the rights of the owner of the easement are paramount." (*Farmers Grain & Supply Co. v. Toledo, Peoria & Western R. R.* (1942), 316 Ill. App. 116, 123, 44 N.E.2d 77, 80.) However, while the owner of an easement is entitled to full enjoyment and every right connected to the enjoyment of the easement, the easement owner has no right, " 'merely for the sake of convenience, to interfere with the owner's control and beneficial use of the land further than is necessary for the reasonable enjoyment of his easement.' " (Emphasis omitted.) (*Peoples Gas Light & Coke Co. v. Cook Lumber Terminal Co.* (1930), 256 Ill. App. 357, 368, quoting *Doan v. Allgood* (1923), 310 Ill. 381, 384, 141 N.E. 779.) Lastly, a court of equity may grant relief as it deems equitable, and it will not require the doing of an act which will result in little benefit to one but great hardship to another. *Beloit Foundry Co.*, 28 Ill. 2d 379, 192 N.E.2d 384.

■ With the foregoing principles in mind and with the one other necessary principle that the granting or denying of injunctive relief is a discretionary ruling by a circuit court, and, absent an abuse of its discretion, a court's ruling will not be overturned upon review (*Talbert & Mallon, P.C. v. Carlson* (1988), 170 Ill. App. 3d 698, 525 N.E.2d 141), we must now apply these principles to the case at hand.

■ In the case *sub judice*, the evidence demonstrated that the intent of the parties at the time of the making of the sanitary sewer easement was not to inhibit development of Outlot 1 and NVSC as a shopping center, but the intent of the parties was that the easement could be moved at the time construction was undertaken in order to prevent a permanent structure from being built over it, thereby making attempts to repair or replace the sewer an expensive proposition. Thus, the intent of the parties in drawing up the easement was not to prevent the construction of permanent structures *per se*. Additionally, given the nature of this particular easement, it is clear that the reason for its granting was to provide the dominant estate (the NVSC property) with the necessary function of waste removal. The purpose of the easement was not to inhibit expansion of the shopping center. The relocation of the sanitary sewer did not deprive the plaintiffs of any of their rights or inhibit the reasonable use of the easement. Further, the court found that the plaintiffs' purpose in enforcing the sanitary sewer easement was not grounded in any use of the actual easement itself but was for the purpose of inhibiting lawful competition. This determination by the court was not ill-founded as the plaintiffs established no evidence of actual injury other than the easement said that the grantor could not build a permanent structure over it. By relocating the easement, the defendants were not building a permanent structure over the easement. In addition, to grant the plaintiffs the injunctive relief requested would work a great hardship upon the defendants at absolutely no benefit to the plaintiffs. Thus, the intent of the parties, when viewed in the circumstances surrounding the granting of the easement, was not to prohibit the relocation of the easement or to hinder expansion of the shopping center. The court's refusal to grant the plaintiffs the permanent injunction was not an abuse of discretion.

Two other subissues raised by the plaintiffs under the issue of the court's failure to enforce the sanitary sewer easement, *i.e.*, that the court erroneously applied the theories of waiver, estoppel, or abandonment and that the doctrine of unclean hands was inapplicable, need not be considered by this court. The circuit court, in its order, did not address these issues, and we decline to find that the court based its decision upon these theories. These issues are, at best, speculative on the part of the plaintiffs.

Similarly, we need not dwell on the plaintiffs' subissue that the court is not required to balance the equities where the defendants proceeded with prior knowledge of the easements. As we noted previously, the granting or denial of an injunction is a matter of discretion,

and as a matter of discretion, a court may do what is reasonable, fair, and equitable. Prior knowledge is not the only factor to be considered by the court, but the court must also consider the intent of the parties in creating the easement, the surrounding circumstances at the time of the creation of the easement, as well as the purpose and use of the easement before and after the creation of the easement when determining whether the injunction should have been granted.

■■ The plaintiffs' last subissue is that the court erred in admitting parol evidence by James Henderson regarding the language of the sanitary sewer easement. The plaintiffs contend that the language of the sanitary sewer easement was unambiguous and, therefore, parol evidence was inadmissible to vary the terms of the easement. Whether language of an agreement is ambiguous and requires additional evidence for interpretation is a matter of law to be determined by the court. (*URS Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 427 N.E.2d 1295.) We do not find that the court erred in admitting James Henderson's testimony regarding the easement. The consideration of the intent of the parties from the document's language and the surrounding circumstances at the time of the creation of the easement is the standard test for determining the rights of the parties under the easement. (*Coomer,* 91 Ill. App. 3d 17, 414 N.E.2d 865.) Henderson's testimony established the parties' intent at the time of the creation of the easement, as well as the evidence of the circumstances surrounding the creation of the easement. Further, while the language of the easement was unambiguous regarding building a permanent structure over the sewer, the easement does not contain language prohibiting the relocation of the easement. Because Henderson's testimony was presented to show the parties' intent at the time of the creation of the easement and clarified whether the easement could be relocated, the court did not violate the parol evidence rule.

The plaintiffs' second contention is that the court abused its discretion in refusing to issue a permanent injunction against the defendants for interference with the plaintiffs' parking easement. As with the plaintiffs' first issue, the plaintiffs again present five subissues under their second issue. The five subissues raised by the plaintiffs are similar to those raised under the first issue, and are: (1) that the courts have uniformly enforced similar parking lot easements in shopping centers; (2) that the plaintiffs had not waived, forfeited, or abandoned their rights to enforce the parking easement; (3) that parol evidence was inadmissible to vary the terms of the unambiguous reciprocal cross-easement; (4) that the doctrine of unclean hands was inapplicable in this case; and (5) that a balancing of the equities was

not required as the defendants proceeded with prior knowledge of the easement. The principles previously set forth in our discussion of the sanitary sewer easement are likewise applicable to this issue, *i.e.*, that the extent of an easement is determined by the intent of the parties and the circumstances surrounding the creation of the easement (*Coomer*, 91 Ill. App. 3d 17, 414 N.E.2d 865); that the intent of the parties can be discerned from the language of the easement if unambiguous; and that the granting or denial of an injunction is a matter of discretion with the court and a court's decision regarding the injunctive relief will not be overturned upon review absent an abuse of discretion. *Talbert & Mallon, P.C.*, 170 Ill. App. 3d 698, 525 N.E.2d 141.

■ In considering the plaintiffs' second issue, we first address the language of the easement in question. The specific language of the easement provided that both of the properties in question shall have "the right to use the exits, entrances and the parking areas created and to be created in connection with its real estate," and a legal description of the properties followed. The subsequent amendment of the declaration of easement of the parking and exits and entrances excluded certain portions of each of the properties from the easements, but these portions are not at issue in this case. The problem presented here is the extent of the cross-easement.

The plaintiffs contend that the language "parking areas created" in the easement referred to the parking spaces in existence before the defendants began their construction and, since the defendants' construction eliminated existing parking spaces, the plaintiffs' rights under the easement were infringed. The plaintiffs also argue that the construction interrupted the traffic pattern in front of the old Kroger store, and that this too infringed on their easement rights of ingress and egress. At trial, the evidence presented by the plaintiffs and the defendants was that there was no definitive traffic pattern or parking space plot plan from which to determine what the rights of the plaintiffs were under this easement. The only plot plan showing a traffic pattern was attached to a short form of Schnuck's lease with Central Bank. This plot plan referred only to Central Bank's property and did not reflect any traffic pattern across Outlot 1. Similarly, a plot plan showing the parking spaces available and where situated and the pattern for traffic flow was not attached to the declaration of easement. In addition, testimony by both plaintiffs' and defendants' witnesses established that there was no pattern of traffic flow across Outlot 1. As we stated previously, the intent of the parties in the granting of the easement is the language of the easement itself *and* the surround-

ing circumstances at the time of the creation of the easement. Without any evidence of the existing traffic pattern or parking spaces available at the time of the creation of the easement, there is no basis upon which to determine what was "created" at the time of the granting of the easement or upon which to enforce a right.

In addition, James Henderson, a party to the creation of the easement, testified that the language "parking spaces created and to be created" was used in order to provide flexibility in changing traffic patterns and parking spaces to accommodate the changes occurring in the expansion of the shopping center. Further, the conduct of the parties after the creation of the easement paralleled the intent testified to by Henderson. The evidence revealed that buildings were erected throughout the parking area and other additions were made in the shopping center after the creation of the parking easement, which redirected traffic and eliminated existing parking spaces and created new parking areas.

The evidence also established that Schnuck's lease with Central Bank provided that Schnuck would have 526 parking spaces, exclusive of the parking stalls on Outlot 1. The evidence did not show that the parking in existence was adequate before the defendants' construction and that the new construction would make the remaining parking spaces available inadequate. The evidence further established that the new construction did not form an insurmountable barrier for vehicles to pass from Outlot 1 onto NVSC's property, for the traffic was able to go around the new construction and travel onto the adjacent property. The plaintiffs have cited several cases in which easements appurtenant in parking lots were enforced; however, none of these cases are dispositive as, in each of the cases cited, there were definitive plot plans which delineated the parking areas to which they had a right under a contract. There were no specific parking spaces shown nor was a definitive traffic pattern demonstrated with the evidence presented here, and, although the traffic pattern and the parking spaces available were altered, the plaintiffs still retained their rights to use them upon the alteration. Under these circumstances, there was no violation of the plaintiffs' rights under the parking easement, and the court did not abuse its discretion in denying the plaintiffs' request for injunctive relief.

We note that the other subissues raised by the plaintiffs were similar to those raised under their first issue. We will not discuss these subissues again at this juncture, and, suffice it to say, the same reasoning given previously under the discussion of those subissues is applicable. Additionally, with regard to the plaintiffs' parol evidence sub-

issue, *i.e.*, that Henderson's testimony regarding the intent of the parties at the time of the creation of the easement was inadmissible as his testimony varied the unambiguous terms of the easement, we find that the language of the parking easement was ambiguous and Henderson's testimony was admissible to clarify the ambiguity.

The third issue raised by the plaintiffs is that the court erroneously admitted testimony regarding an unconsummated settlement agreement between Jack Chor, property manager for Central Bank, and Robert Bruner, Shop 'N Save's representative. The plaintiffs contend that evidence of settlement agreement negotiations was inadmissible and that the introduction of this evidence prejudiced the plaintiffs. The evidence to which the plaintiffs objected occurred in the defendants' cross-examination of Robert Bruner, an adverse witness called by the plaintiffs. On direct examination of Bruner, the plaintiffs had questioned Bruner about his two meetings with Jack Chor. During the questioning by the plaintiffs, evidence was elicited that Bruner, Chor and Wetterau discussed the problem of Shop 'N Save's construction encroaching upon Central Bank's property. During plaintiffs' questioning, no questions were asked about any financial considerations for the encroachment; however, defendants' counsel elicited such testimony in his cross-examination. The court allowed the questioning over the plaintiffs' objection, after defendants' counsel stated that he was asking the questions simply to show the conversation between them, and after the defendants' counsel argued to the court that this was not a settlement negotiation protected by law as there was no pending lawsuit at the time the discussions took place.

The plaintiffs are correct in their statement of the law that offers of settlement are ordinarily inadmissible. (*Gaslite Illinois, Inc. v. Northern Illinois Gas Co.* (1977), 46 Ill. App. 3d 917, 362 N.E.2d 725.) Further, we agree with the plaintiffs that the evidence elicited by the defendants' counsel on cross-examination could be construed as settlement agreement negotiations. Thus, the circuit court erroneously admitted Bruner's testimony regarding monetary compensation for the defendants' encroachment; however, we do not find that this error requires reversal. In this case, the trial was a bench trial, and the well-established presumption is that a court considered only competent evidence in reaching its decision, and that the admission of incompetent evidence is harmless. (*Magnone v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 170, 466 N.E.2d 1261.) The court's decision did not reflect that it considered the evidence of the settlement negotiations in its decision, and there is no further evidence presented that the court relied on the evidence suffi-

cient to rebut the presumption that it considered competent evidence only. Therefore, we find the court's error to be harmless.

■■■ The plaintiffs' next contention is that the court abused its discretion in allowing Philip Corlew to testify as an expert witness as he was not timely disclosed to the plaintiffs as required under Supreme Court Rule 220. (134 Ill. 2d R. 220.) Supreme Court Rule 220(b) provides as follows:

"Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:

(i) ascertain the identity of such witnesses, and

(ii) obtain from them the opinions upon which they may be requested to testify.

In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later. *** All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence. *** Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." (134 Ill. 2d R. 220(b).)

This court has previously held that Rule 220 is mandatory: expert witnesses must be disclosed within 60 days prior to the commencement of the trial, and failure to do so is a violation of the rule. *Klingler Farms, Inc. v. Effingham Equity, Inc.* (1988), 171 Ill. App. 3d 567, 525 N.E.2d 1172.

■■■ In the case *sub judice*, interrogatories requesting disclosure of the defendants' expert witnesses were propounded to the defendants by the plaintiffs on October 6, 1989, and on December 5, 1989. In the defendants' answer to the interrogatories regarding expert witnesses, the defendants stated that "None were known at this time." The defendants never supplemented their answers regarding this inquiry. On March 2, 1990, the defendants filed their counterclaim in which they sought a declaratory judgment regarding the relocation of the sanitary sewer easement. Trial commenced, as was previously stated, on March 13, 1990. The second day of trial was on April 2, 1990. In between the first day of trial and the second day of trial, on March 19

or 20, 1990, the defendants disclosed to the plaintiffs that they expected to call Philip Corlew as an expert witness. On April 2, 1990, when the defendants advised the court that they intended to call Corlew, an engineer and registered land surveyor, as a witness following the lunch break, the plaintiffs objected on the basis that Corlew was not disclosed as an expert witness under Rule 220. After some discussion, the plaintiffs said they would not object to Corlew if they had an opportunity to talk to him during the lunch break, which they did. Upon the court's reconvening after lunch, the plaintiffs renewed their objection to Corlew's testimony; however, the plaintiffs explained that they did not object to Corlew's testimony regarding the relocation of the sewer easement, but that they objected to the remainder of Corlew's testimony. The court allowed Corlew to testify over the plaintiffs' objection.

Based upon the circumstances presented here, we find that the allowance of Corlew's testimony, with the exception of his testimony regarding the relocation of the sewer, was a violation of Rule 220 as the disclosure of Corlew as an expert witness was made after the trial had commenced. However, we find that the admission of Corlew's testimony was harmless error. Corlew's testimony, with the exception of his evidence regarding the relocation of the sanitary sewer easement, basically corroborated other witnesses' testimony, *i.e.*, his testimony regarding the changes in the buildings on the properties since 1972, the sidewalk and the canopy of the old Kroger store that were constructed over the sanitary sewer, and how far the new addition extended into the parking lot, and, therefore, Corlew's testimony was cumulative. Additionally, it should be noted that the plaintiffs' expert, Kankolewski, relied upon past surveys done by Corlew in his testimony, and one of the surveys done by Corlew was at the plaintiffs' request. Since the testimony objected to by the plaintiffs was basically cumulative, the violation of Rule 220 was harmless error. Further, since the plaintiffs did not object to Corlew's testimony regarding the relocation of the sanitary sewer easement and its cost, they waived any objection to this testimony being admitted. *Puskar v. Hughes* (1989), 179 Ill. App. 3d 522, 533 N.E.2d 962.

The plaintiffs' fifth issue is that the court erred in denying their motion to dismiss the defendants' counterclaim for a declaratory judgment. The plaintiffs contend that their motion should have been granted because the defendants failed to join several tenants of Central Bank who were also served by the sanitary sewer. The plaintiffs argue that these additional tenants were necessary and indispensable parties to this litigation, and that the denial of the plaintiffs' motion

to dismiss for failure of the defendants to join these tenants was erroneous. We disagree.

■ The rule is well established that all persons who are indispensable parties to an action must be joined or an order entered without jurisdiction over an indispensable party is null and void. (*Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 362 N.E.2d 382.) However, the rule requiring joinder of indispensable parties is not applied when a party who is not before the court in person is so represented by others that his interest receives actual and efficient protection, *i.e.*, when the "doctrine of representation" is applicable. (*Moore*, 48 Ill. App. 3d 152, 362 N.E.2d 382.) We find that the "doctrine of representation" is applicable in this case.

■ Here, the subject of the litigation was the right in the sanitary sewer easement and its relocation. Central Bank, the owner of the easement and the landlord of the tenants in question, was a party to the cause of action. Likewise, Central Bank's largest tenant, Schnuck, was also a party litigant. We cannot determine that the interests of the remaining tenants of Central Bank were not adequately and efficiently represented by these two parties. The plaintiffs argue that it is a "possibility" that any one of the several tenants may seek a determination of its rights in the sanitary sewer in the future, but plaintiffs do not explain how those rights would be different from those asserted in this case. It has been held that a party which holds an easement right can adequately represent the rights of the other easement holders in a litigation involving the easement. (*People ex rel. Carson v. Mateyka* (1978), 57 Ill. App. 3d 991, 373 N.E.2d 471.) We find that the court did not err in denying the plaintiffs' motion to dismiss the defendants' counterclaim to relocate the sanitary sewer easement.

The plaintiffs' sixth and last contention is that the court abused its discretion in denying their motion for a continuance. The thrust of the plaintiffs' argument is that the defendants' counterclaim, in which the defendants sought relocation of the sanitary sewer easement, was filed on March 2, 1990, when the case was already set for trial on March 13, 1990, a date prior to the 21 days in which the plaintiffs had to file an answer to the counterclaim. Because the scheduled trial date was March 13, 1990, and because the court had imposed a discovery cut-off date of March 9, 1990, the plaintiffs alleged they were prejudiced in that they were given no opportunity to conduct discovery on the counterclaim.

■ It is well established that a litigant has no absolute right to a continuance, and that a granting or denial of a motion for continu-

ance is within the discretion of the circuit court. (*Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 392 N.E.2d 77.) A court of review will not overturn a court's ruling on a motion to continue unless the determination is an abuse of discretion, *i.e.*, where the denial of the continuance resulted in palpable injustice to the movant. (*Montgomery*, 73 Ill. App. 3d 650, 392 N.E.2d 77.) We do not find that the court abused its discretion in its denial of the plaintiffs' motion for continuance in the instant case as there is no evidence that the plaintiffs were prejudiced by the court's decision.

■■ Here, the plaintiffs filed their second amended complaint on February 21, 1990. Subsequently, the defendants filed their answer and their counterclaim on March 2, 1990. The plaintiffs filed their motion for continuance on March 9, 1990, and this cause went to trial on March 13, 1990. The defendants' counterclaim was not heard until April 2, 1990, approximately one month after the filing of the counterclaim. Additionally, the plaintiffs filed their answer to the counterclaim on March 27, 1990. Obviously, the plaintiffs were not prejudiced by being unable to file an answer to the counterclaim, as they did so. The plaintiffs' primary contention is that they were prejudiced as they were not afforded an opportunity to have discovery on the counterclaim. The plaintiffs do not state what evidence they needed to discover to counteract the counterclaim. The plaintiffs similarly did not request an extension of the time schedule for discovery. In addition and most significantly, the plaintiffs' expert witness, Kankolenski, testified that the sanitary sewer easement could be easily relocated. We find that the plaintiffs were not prejudiced by the court's denial of their motion for continuance.

■■ The final matter to be considered by this court is the plaintiffs' motion to strike portions of the defendants' brief, which was presented in the plaintiffs' reply brief. In their motion, the plaintiffs contend that certain portions of the defendants' brief must be stricken because "The [defendants'] Statement of Facts fails to set forth fairly all the facts necessary to an understanding of the case, in that it only refers to facts favorable to Defendants and omits all other facts, and contains a large amount of invective, argument and comment." Therefore, the plaintiffs state that under Supreme Court Rule 341(f) (134 Ill. 2d R. 341(f)), the defendants' factual statements made under its argument portions of the brief should be stricken. Without going into excessive detail, suffice it to say that we find that the defendants' brief does not violate Rule 341(f). Both the plaintiffs' and the defendants' briefs set forth facts which are advantageous to each

and omit facts which may be harmful to their respective cases. We decline to strike any portion of the defendants' brief.

For the foregoing reasons, the judgment of the circuit court of Madison County denying the plaintiffs injunctive relief and granting the defendants declaratory judgment is affirmed.

Affirmed.

HOWERTON and CHAPMAN, JJ., concur.