FREDERICK P. SEYMOUR, JR., *et al.*, Plaintiffs and Counterdefendants-Appellees, v. HARRIS TRUST AND SAVINGS BANK OF CHICAGO, as Trustee, *et al.*, Defendants and Counterplaintiffs-Appellants.

First District (2nd Division)    No. 1—92—0743

Opinion filed June 7, 1994.—Rehearing denied July 21, 1994.

HARTMAN, J., dissenting.

Joyce & Kubasiak, P.C., of Chicago (Edward T. Joyce and Arlyn G. Miller, of counsel), for appellants.

Bell, Boyd & Lloyd, of Chicago (John P. Scotellaro and Randy J. Curato, of counsel), for appellees.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
Plaintiffs Frederick P. and Janet S. Seymour filed this action for declaratory judgment and injunctive relief alleging that defendants Robert W. and Katherine B. Stotler, their neighbors, were impermissibly interfering with their right to use two easements on defendants' property. In an agreed order, the circuit court granted plaintiffs' motion for summary judgment on defendants' affirmative defenses of *laches*, nonuse, abandonment, and estoppel. It later granted plaintiffs summary judgment on the defense of merger as well, but it denied summary judgment on the defense of impossibility of use. The court also denied plaintiffs' subsequent motion to clarify that the only remaining issue for trial was impossibility of use. At the close of defendants' case in chief on their affirmative defenses, the circuit court ruled in plaintiffs' favor, ordering defendants to remove a wrought iron fence and gate from the easements, to remove plantings placed by them in the easements that obstructed plaintiffs' access, and to allow plaintiffs to use the easements. Defendants ask for vacatur of the order granting summary judgment for plaintiffs on the issue of merger and for a trial on that issue. Defendants also ask that the final judgment be reversed, or, alternatively, vacated and remanded for a new trial. At the very least, they claim, we must remand for clarification of the relief ordered.[1] We affirm.

Plaintiffs have owned and resided at 303 Sheridan Road (Lot 3) in

---

[1]Defendants' notice of appeal challenges all three orders. They ask that

Winnetka since 1963; defendants have resided since 1982 at 301 Sheridan Road (Lots 1 and 2).[2] Defendants' property is bordered by plaintiffs' property on the west and Lake Michigan on the east; there is a bluff at the eastern end of the property, overlooking the lake. Running along the south lot lines of the parties' properties is Elder Lane Park (the Park), which is owned by the Winnetka Park District (the Park District).

The lots at issue were created in 1924 by a subdivision of a piece of property. This subdivision created two easements running east-west between the lake and Sheridan Road: a 20-foot easement across Lots 2, 3, and 4 for roadway, sidewalk, and utility uses, and a three-foot easement across Lot 1 for lake access (collectively, the easements).[3] In 1970 or 1971, the owners of 303 and 301 Sheridan Road, then plaintiffs and the family of Mr. Seymour's brother, [4] respectively, erected a chain link fence to separate the Park from their properties; this fence is located mostly south of the southern property line of Lot 1. Defendants have planted shrubs and made other improvements within the two easements; across the 20-foot easement, they also have erected a wrought iron fence with a locked gate. Defendants denied plaintiffs any access through the locked gate but permitted them access through a separate, unlocked gate to the south of the wrought iron fence. According to the survey, this gate is partly on the easement across Lot 1 and partly on the adjacent Park District property.

---

the first order, an agreed order, be vacated on the ground that there were disputed questions on estoppel, *laches*, nonuse, and abandonment, and that the issue, therefore, be remanded for trial. Not only was this an agreed order, however, but defendants present no arguments for reversing it. Therefore, we do not address it.

[2]Title to defendants' property is held by defendant Harris Bank as trustee, with defendant Katherine Stotler as sole beneficiary.

[3]The plat in which the subdivision was recorded contained the following easement provisions:

"The southeasterly twenty (20) feet of each said Lots 2, 3 & 4, are subject to perpetual easements to be enjoyed in common by owners of all said Lots 1, 2, 3 and 4 as follows:

For sidewalk, sanitary sewer and manholes in conjunction therewith; water mains, gas mains, electric and telephone wires and conduits; roadway and storm sewer. The southeasterly three (3) feet of said lot 1 is subject to a perpetual easement to be enjoyed in common by the owners of said Lots 1, 2, 3 and 4 for access and passage to the waters of Lake Michigan."

[4]Plaintiff's brother and his family lived at what is now defendants' residence between 1963 and 1982.

In 1988 plaintiffs filed this action for declaratory judgment and injunctive relief, alleging that defendants had physically obstructed and interfered with their use of the easements and had told them they could not use them. In particular, they claimed that defendants encroached upon the 20-foot easement by planting shrubs and trees throughout it, by maintaining an addition that encroaches on it, and by erecting the wrought iron fence across it. They also claimed that defendants had planted shrubs, trees, and hedges throughout the three-foot easement. Defendants admitted planting and making other improvements within the easements, but they denied that they had interfered with any proper use thereof. They also raised affirmative defenses: with regard to the three-foot easement, they claimed estoppel for failure to maintain, *laches*, estoppel due to the existing path running along the south side of the easement, and lack of ripeness. For the 20-foot easement, they raised defenses of lack of ripeness, *laches*, and estoppel. In addition, they counterclaimed for a declaration of extinguishment of the three-foot easement for failure to maintain, which they deemed abandonment, or alternatively, termination of the easement because its use was too dangerous, it had been abandoned, and natural growth obstructed the 20-foot easement. They too asked for injunctive relief.

Plaintiffs then moved for summary judgment on the affirmative defenses. At oral argument, the court observed that it was granting summary judgment for "[a]ll issues now before the Court" except the issue of merger and the factual question of impossibility of use, commenting "[t]hat doesn't mean that [defense] counsel can't think up some other issue that's not present now." The court also found that defendants had not offered enough evidence on the need for the fence. Plaintiffs acknowledged that they were not at that time seeking relief from the alleged encroachment by defendants' house into the 20-foot easement.

The court then entered an agreed order, finding that there were no disputed material facts with respect to the issues of *laches*, non-use, abandonment, and estoppel, and it entered summary judgment in plaintiffs' favor on these points. It also found that the wrought iron fence was not required for defendants' security and noted that plaintiffs were not seeking to have the encroaching addition altered or removed. The court did find, however, that there was a disputed issue of law regarding the effect of the merger doctrine on the 20-foot easement as well as disputed issues of material fact regarding impossibility of use, so it denied the motion for summary judgment as to these two questions.

Plaintiffs filed a second motion for summary judgment "on all

remaining issues," which they defined as merger and impossibility of use. Defendants responded with a list of what they regarded as questions of material fact, mostly with regard to the latter issue. Plaintiffs replied that these purported material factual disputes were not material or were not supported by any evidence and so were fodder for summary judgment. In particular, they argued that defendants had the burden of proof as to the extent to which the relocated plantings in the three-foot easement did not obstruct plaintiffs' use thereof as well as to the cost for relocating them back to the Park District's property. After argument, which is not in the record, the circuit court granted plaintiffs' motion as to merger but denied it as to impossibility of use, "based on the existence of a question of fact as to whether or not the three-foot easement is possible to use."

Subsequently, plaintiffs moved for clarification or modification of the order to specify the issues to be tried. The motion was denied. The court stated:

"I recognize the ambiguity that might exist [in the first order], but I think all that I made rulings upon were the so-called affirmative defenses being asserted.

And I continued, and I suppose by these remarks I'm going to be somewhat in direction to whoever succeeds me on this case, but it was my specific intent to limit the issues to be tried to those issues that I specifically referred to in those remarks; you know, the impossibility and the failure of purpose issues."

Plaintiffs filed yet another motion for summary judgment on impossibility/failure of purpose. Apparently they abandoned it.

At trial, Frederick Seymour himself took the stand. He explained that he had installed the chain link fence between the Park and the properties at issue, from west of Lot 3 to the top of the bluff in 1980, with the Park District's permission to do so on its property. The fence had been extended eastward by defendants. When defendants bought the property in 1982, there had been plantings on the north side of this fence, which had infringed on but did not block the easement. He stated that the privet hedges blocked the three-foot easement, but he agreed that they had been there as long as he could remember. The sheet piling across the foot of the bluff had been in place in 1963, but the concrete block wall at the foot of the bluff had been installed by defendants after this lawsuit began. Prior to that, the bluff at the easement had sloped down to the beach at the same slope as the rest of the bluff to the north.

Defendants had put in a flower bed following the driveway curve, he stated, as well as evergreens "that totally crossed the 20 foot

easement"; he just walked around them. He had not objected because these represented "a remarkable improvement" and did not restrict his access to the lake, which had been across defendants' lawn, not in the three-foot easement itself, without objection by defendants. Similarly, he had felt no need to object when defendants relocated existing plantings from along the fence (*i.e.*, from Park District property) four to six feet north (*i.e.*, to within the three-foot easement). It was not until April 1988, when Seymour first saw the wrought iron fence between the chain link fence and defendants' house, that he began to think his rights were endangered. When he spoke with Stotler about the new fence, the latter pointed to an unlocked gate extending south from the new fence and told him, "There is your easement." When Seymour had objected that this gate was on Park District property, Stotler had replied, "That was that" and Seymour "should do what [he] had to do." Seymour had never tried to use the pathway defendants created, but he knew he could not after observing it from the park side; he had not walked down the bluff in the park.

Raymond Hansen, who prepared the survey of the south lot line of the properties at issue, testified. He explained how he located the plants and the fences for the survey, and he testified that the existing path is "primarily" on the Park District's property.

As their first witness, defendants called Robert Stotler. He had been aware of the two easements, and he had learned that the chain link fence was on Park District property in 1983. He stated that the barberry bushes from the top to the bottom of the bluff were in place when he purchased the property and that they were effective in slowing down erosion. He had never invited plaintiffs or their guests onto his beach and had never told them they could use the yard, beach, or slope at will, but he conceded that he had permitted them to do so and had not told them to stop. In early 1984, however, Stotler and his wife had told plaintiffs they were unhappy with plaintiffs' use of the yard and that they might move bushes to create a path to ensure their privacy. When plaintiffs continued to walk through the yard, defendants paid $1,000 to move various plantings four to six feet north to create an unobstructed path for plaintiffs. The estimated cost for moving them again was $7,000, and there was no guarantee of survival. Nevertheless, plaintiffs and their friends continued to walk across defendants' yard at all hours until 1988, when he had installed a wrought iron fence north and south from his house to the respective property lines. He gave four reasons for having done so: an intruder had frightened them; they had received a kidnapping threat against their daughter in 1986; they were worried about the

possibility of her wandering down the driveway toward Sheridan Road; and they wanted to encourage plaintiffs to use the path rather than their yard. The gate on the north side of the house is left unlocked for garbage men and the like; the south gate is locked.

Stotler described the erosion that had occurred since he had purchased his house and the current conditions. Regarding the Park District's property to the south, he said, "the whole thing one day just caved in" and caused a cave-in on his land. He also recounted his own repair efforts, including rebuilding the bluff and constructing the steel-reinforced concrete wall, which cost $17,000. The slope down from the bluff, which now has grass and is 25 feet high, has subsequently shifted. To avoid destroying it, his family never walks on it to get to the beach, using a new $16,000 stair instead; replacing this stair would cost $30,000. Stotler also described the current path along the chain link fence, which he had walked the night before he testified; to go down the bluff to the lake is too dangerous, so the path ends at the top of the bluff. According to his research, the primary cause of erosion on the bluff is rain water, not high lake levels or waves.

Expert testimony on the condition of the easement was heard from Dr. Charles Collinson, principal geologist for the Illinois State Geological Survey (Geological Survey). Among his responsibilities are monitoring the conditions at the shoreline, calculating current and past rates of erosion, and providing free consulting services to land-owners. He had personal knowledge of the general and specific conditions since 1974 at defendants' property and the properties north and south of it. In September 1986, the bottom of the bluff was "well protected" by the sheet piling, but the 30 degree slope was "seriously oversteepened," making it "highly vulnerable to failure" when compared with the lower portion, which was more stable. He described the Park's bluff where it abutted defendants' property as "essentially unstable [and] exposed to [direct] wave action" and spray; he explained that it had "failed" in 1986 (the high water year), by which he meant that materials were falling onto the beach and into the lake, exposing raw vertical faces of earth. A year later, in 1987, new sheet piling had been erected along the park, but slumping had occurred at the south end of the lower bluff on defendants' property, which was attributable to saturation with rain. A May 1989 photo showed defendants' new concrete retaining wall, the purposes of which include support for the lower slope and protection against wave impact as well as facilitation of dewatering of the sand upslope. Had it not been built, Collinson continued, "there undoubtedly would have been increased gullying right" at the easement's lower slope

due to the fence and the adjacent park land, which was susceptible to gullying. From soil boring information from 1989, a very dry year, he concluded that the site was "essentially a sand-filled slope" with indications that the southern portion was wet and steeper and thus "highly vulnerable." The Geological Survey's boring in the park showed similar conditions. In pictures, Collinson saw slippage at mid-slope from 1986 through the time of trial, which led him to conclude that the area was inherently unstable; he assumed that this slippage occurred at the easement, which was obscured by trees in the photographs. The day prior to his testimony, he had seen that sod was slipping away despite the new retaining wall.

With regard to conditions at the easement in particular, Collinson characterized the easement's slope as "highly vulnerable, and as [he] stated in private, [he] think[s] that [defendants are] living on the edge," that is, "[defendants] could experience major failures[,] even today with [the] improvements[,] at almost any time." He conceded that in 1989 his primary concern had been the north portion of defendants' property, and that when he had written to plaintiffs' counsel that "the property appears to be well kept and stable," he had not mentioned any vulnerability or instability on the south portion. He cautioned, however, that he had received additional information since then. The privet hedge in the easement, Collinson observed, was beneficial to slope stabilization and he had recommended to defendants several times to undertake additional such plantings. Removing the privet hedge would have a negative effect on slope stability because the roots help retain the slope and removing the plantings on the bluff would leave an area with raw soil exposed. He further commented that removal of plantings from the top of the bluff west to the house along the fence would be detrimental to stabilization because those plantings "undoubtedly remove a lot of water from those underlying sand layers." He later acknowledged, however, that the trees at the top of the slope would serve essentially the same purpose if they were moved three feet. He added that because part of the Park is lower than defendants' property, increased rain runoff would occur in the easement area, which would make the slope there less stable.

On cross-examination, Collinson agreed that the major causes of severe bluff erosion are high lake levels and storm-induced wave action at the foot of such bluffs, as stated in a pamphlet from the Division of Water Resources in the Illinois Department of Transportation, "Harmony with the Lake, Guide to Bluff Stabilization, Lake Michigan." Thus, if the bottom of a bluff is unprotected, wave action will cause collapse, as it had at the Park. Where there is sheet pile

revetment at the bottom of a bluff, however, "the role of the lake [in erosion] is greatly decreased," as further evidenced by the lack of failure at a protected area in another park to the south in comparison with failure where it was not so protected; when such protection is constructed, heavy rainfall becomes key.

Collinson later mentioned that even with the sheet piling at the Park's and defendants' bluffs, a severe storm with the main wave front in the east or southeast quarter would damage the southeast corner of defendants' bluff face, *i.e.*, at the easement, due to significant wave splash. In addition, in the year prior to the trial, he had seen deterioration at the Park bluff's north end, which would affect defendants' adjacent property with increasing destabilization and concentration of rainfall runoff. According to the pamphlet, the first step in preventing erosion is to erect protection at the base of a bluff, followed by reshaping its slope to at least $1^1/2$ to 1, as defendants' slope is, if possible and when necessary. Controlling excessive surface water runoff is the next step, followed by controlling excessive ground water seepage, which defendants had done. The last step is to revegetate the bluff face as necessary, which defendants also did, though Collinson disagreed with defendants' choice (lawn) there. He explained that vegetation shields soil from rain impact and that herbacious plants, especially grasses, retard rapid rain runoff. For intercepting rainfall, grasses, shrubs, and trees are equally effective, but for retarding runoff and filtering surface soil particles, shrubs and trees are poor compared to grasses. Grass has very low stability on a steep slope, and having mown grass slopes is "just asking for it." He would recommend that any new plantings be "woody type" to preserve the bluff.

Collinson stated that "it's [his] opinion it is highly inappropriate that there be any foot traffic there" and that it would be dangerous to the person walking down, noting that there would be no warning of possible cave-in or collapse. In addition, heavy rainfall would result in further destabilization of the easement's slope. Although he appeared to believe that the lot line was at the chain link fence, his testimony would be no different if the lot line were four or five feet north of that fence except that the gullying now tended to be adjacent to the fence. Places with maturely wooded slopes, relatively low slopes, thick soil, or a relatively stable, well-drained clay slope, he explained, can tolerate foot traffic, but at the easement, "there will be an increase in gullying [and] greater susceptibility to damage from foot traffic." Collinson also mentioned foot traffic could have

caused the current gullying if made by defendants' work crews,[5] but that such damage could be repaired by seeding over. He also agreed that the bluff was in the same position as it had been since 1937.

After defendants stipulated that "it is not impossible for someone to walk" along the three-foot easement down the bluff to the lake, Collinson rejected the word "destroy" as "a vague, precipitous term that just doesn't really apply in nature," prefering instead "impact," by which he meant to affect a thing's condition negatively. He then agreed that "walking down the slope may have some effect on it, \*\*\* [d]epending on who, when, under what climatic conditions, under what soil conditions, whether fast or slow, adults, children, all sorts of things." Asked whether if the easement were used but "maintain[ed] by filling in any gullying or anything like that that occurred, then there would be no damage to the slope," Collinson replied:

> "There are conditions where, for example, during a period of heavy rainfall, and it occurs, the traffic causes some precipitous damage, and the conditions are such that a remediation action of fixing it must be delayed or the condition will become such that more damage will ensue by bringing someone in."

He foresaw "conditions like that causing a very serious condition" if the ground was saturated, even with only a few people walking down the slope. In fact, if the soil was saturated and extremely heavy rain had fallen over a period of time, even a single person walking down the slope at the easement could cause a cave-in at the easement; he himself had caused the collapse of a significant portion of a bluff. If the slope failed at the easement, he believed, that cave-in could trigger a large area of failure north of the three-foot easement. Collinson conceded that damage caused by walking on the slope can be repaired, though perhaps at great expense, just as defendants have repaired their bluff after damage caused mostly by high lake levels. He also agreed that if foot traffic did occur and the easement was not planted with dense woody shrubs, as he had recommended, the easement could be maintained if monitored and other steps taken.

At the end of defendants' case in chief, plaintiffs moved for judgment in their favor under section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110 (now 735 ILCS 5/2—1110 (West 1992))) on the defense of impossibility. In a written memorandum, the circuit court ruled in plaintiffs' favor both on their complaint and on defendants' counterclaim. It not only determined that the fence, gate, and plantings had been installed by

---

[5]Stotler later testified that the crews had used a stair on the north side of the lot.

defendants only recently and "wholly interfered with [plaintiffs'] use of the easement *** to access Lake Michigan," but it also found, with regard to the defense of impossibility of use, that

> "the evidence fails to show conclusively that the removal of the plants [in the three-foot easement] will cause the erosion of the easement. Testimony at trial indicated that most erosion of the land is caused by the wave action from the lake, rather than by foot traffic. *** Finally, removal of the fence and gate pose no threat to the maintenance of the land."

The court further determined that defendants intentionally took action to prevent plaintiffs from using the easement by installing plantings and a fence with a locked gate despite being aware of the easement, and that the intentional nature of this conduct allowed the court not to take into account a balance in the equities when deciding whether to grant plaintiffs' request for injunctive relief. It then ordered defendants to remove the gate and fence as well as any plantings placed by them in the easement if obstructing plaintiffs' lake access, and to permit plaintiffs to cross to and from the lake over the easements.

I

■ Prior to our analyses of the summary judgment order and the final order, we believe that an overview of the applicable substantive law would be useful. First, "two distinct tenements are necessary to the creation of an easement,—the dominant to which the right belongs, and the servient upon which the obligations rests." (*Chicago Title & Trust Co. v. Wabash-Randolph Corp.* (1943), 384 Ill. 78, 84, 51 N.E.2d 132, 135-36.)

> "An easement is a right or privilege in the land of another, and, if it is exercised in connection with occupancy of other land, it is appurtenant thereto. [Citation.] An easement appurtenant passes by the conveyance of land to which it is annexed, and an easement appurtenant continues until the easement is either terminated or abandoned. [Citation.] Where an easement is created by an instrument, the document must be construed in accordance with the intent of the parties, and such intention is ascertained from the words of the instrument and the circumstances contemporaneous with the creation of the easement. [Citation.] Additionally, '[t]he use to which an easement is devoted or for which it is granted determines its character and to the extent for which it is necessary to carry out the purpose of the grant, the rights of the owner of the easement are paramount.' [Citation.] However, while the owner of an easement is entitled to full enjoyment and every right connected to the enjoyment of the easement, the easement

owner has no right, ' "merely for the sake of convenience, to interfere with the [fee] owner's control and beneficial use of the land further than is necessary for the reasonable enjoyment of his easement." ' (Emphasis omitted.) (*Peoples Gas Light & Coke Co. v. Cook Lumber Terminal Co.* (1930), 256 Ill. App. 357, 368, quoting *Doan v. Allgood* (1923), 310 Ill. 381, 384, 141 N.E. 779.) Lastly, a court of equity may grant relief as it deems equitable, and it will not require the doing of an act which will result in little benefit to one but great hardship to another. [Citation.]

*** [T]he granting or denying of injunctive relief is a discretionary ruling by a circuit court, and, absent an abuse of its discretion, a court's ruling will not be overturned upon review [citation]." (*Schnuck Markets, Inc. v. Soffer* (1991), 213 Ill. App. 3d 957, 974, 572 N.E.2d 1169, 1181-82, *appeal denied* (1991), 141 Ill. 2d 560, 580 N.E.2d 134.)

See also *McCann v. R.W. Dunteman Co.* (1993), 242 Ill. App. 3d 246, 609 N.E.2d 1076 (general easement law), *appeal denied* (1993), 151 Ill. 2d 566, 616 N.E.2d 336; *Continental Cablevision of Cook County, Inc. v. Miller* (1992), 238 Ill. App. 3d 774, 787, 606 N.E.2d 587, 595, *appeal denied* (1993), 149 Ill. 2d 648, 612 N.E.2d 587 (standard of review is abuse of broad discretion; that is, was decision against the manifest weight of the evidence).

■ As for the relative rights and obligations of the owners of the dominant and the servient estates:

"In the absence of an agreement to the contrary, the owner of the easement has not only the right but the duty to keep the easement in repair while the owner of the servient tenement has no duty to either put or keep the easement in repair. [Citation.] The owner of the dominant estate is entitled to the necessary use of the easement. Necessary use has been defined as such use as is reasonably necessary for the full enjoyment of the premises. [Citation.] Moreover, although the owner of the dominant estate has the duty to maintain and repair the easement, he cannot make material alterations in the character of the easement, even though it would be more to his convenience to do so, if the alteration places a greater burden upon the servient estate or interferes with the use and enjoyment of the servient estate. [Citation.]

*** [T]he owner of a right of way for ingress and egress has the right to use the full width of the area or strip having definite boundaries unhampered by obstructions placed thereon. [Citation.] However, natural obstructions, such as bushes and trees, which existed at the time of the grant of the easement and were not placed there by the owner of the servient estate have been

recognized as an exception to this rule." (*Flower v. Valentine* (1985), 135 Ill. App. 3d 1034, 1039-40, 482 N.E.2d 682, 687.) (See also *Page v. Bloom* (1991), 223 Ill. App. 3d 18, 22, 584 N.E.2d 813, 816 (the right and duty to maintain the easement rests with the owner of the dominant tenement, who must be allowed to keep the easement in repair so as to make it reasonably usable).) When the two parties have irreconcilable interests, the owner of the dominant estate may repair or maintain the easement as necessary to preserve his use, but he cannot unreasonably interfere with the servient estate owner's use. (*Beggs v. Ragsdale* (1983), 120 Ill. App. 3d 333, 337-38, 457 N.E.2d 1079, 1082.) The question of reasonableness is one of fact in the circumstances. *Professional Executive Center v. La Salle National Bank* (1991), 211 Ill. App. 3d 368, 379, 570 N.E.2d 366, 373.

■ For the quantum of evidence necessary to grant injunctive relief in a case like this one,

> "the rule is that before equity will take jurisdiction to protect rights under such an easement the proof must be clear and convincing, so as to remove every substantial doubt of the existence of such rights. [Citation.] It has also been said that 'Restrictions on the use of property held in fee are not favored, yet where the intent of the parties is clearly manifested in the creation of restrictions or limitations upon the use of the grantee, for the benefit of the grantor, his heirs or assigns, a court of equity will enforce the same.' " (*Chicago Title*, 384 Ill. at 84, 51 N.E.2d at 135, quoting *Eckhart v. Irons* (1889), 128 Ill. 568, 581, 20 N.E. 687.)

Mandatory injunctions are proper even for minor interference with use of an easement appurtenant. *Mutual of Omaha Life Insurance Co. v. Executive Plaza, Inc.* (1981), 99 Ill. App. 3d 190, 195, 425 N.E.2d 503, 507.

The case cited most often by both parties deserves special attention. *Flower v. Valentine* (1985), 135 Ill. App. 3d 1034, 482 N.E.2d 682, concerned a similar pair of properties that, coincidentally, lie not far from the subject properties; there too the easement was for lake access. In that case, the owner of the servient estate moved to enjoin the dominant estate's owners permanently from entering her property and from moving or removing any vegetation in the easement. The defendants counterclaimed for injunctive relief to prevent interference with the use of their easement, and asked that the plaintiff be ordered to remove certain obstructions.

In *Flower*, the precipitating event had occurred when the defendants, new owners, began to remove vegetation to clear the easement, which had fallen into disuse. The court rejected the plaintiff's contention that the easement had been extinguished for

lack of use by the owner of the dominant estate, commenting that an express grant cannot be lost by mere nonuse but must be accompanied by an intent to abandon the use. The court then held that the defendants could remove those shrubs in the easement that the plaintiff had planted after the easement was created, but that all bushes that had existed at the time the easement was granted were exempt from the general rule that the right of way easement should be unhampered by any obstruction, so they could remain. The court similarly found that a barbecue, even though a permanent obstruction erected by the owner prior to the granting of the easement, could remain because to order removal would be inequitable in light of the cost and lessening of value of the servient estate as well as the ease with which the dominant estate owner could simply walk around it. The plaintiff was ordered, however, to cease interfering with the easement, as she had done by placing tables, chairs, plantings, a gate, and debris in it as well as by objecting to the defendants' use of the easement and to their plans to build new steps thereon down to the lake. Lastly, the court remanded for a hearing on the plaintiff's expert's testimony regarding erosion resulting from the defendants' clearing the vegetation, noting that an easement owner cannot injure the easement area or adjacent property and that the plaintiff did not have to wait until the damage was done before requesting injunctive relief.

With these principles in mind, we turn to the merits.

## II

The circuit court granted summary judgment in plaintiffs' favor on defendants' affirmative defense of merger of the 20-foot easement in Lot 2 by virtue of unity of ownership in Lots 1 and 2. The record does not reveal the reasons underlying the court's ruling.

Defendants begin their argument with the general rule of merger that when the dominant (benefited) estate and the servient (burdened) estates are owned by the same person, an easement is extinguished by virtue of unity of title and possession, given that one has no need of an easement over one's own property. They argue that under a "logical reading" of the grant of the 20-foot easement over Lot 2, the grant was solely for the benefit of Lot 1's utility service and roadway access, and not for the benefit of Lot 3 (plaintiffs' property) or Lot 4. They conclude, therefore, that the 20-foot easement on Lot 2 was extinguished by operation of law when Lots 1 and 2 came under the same ownership. Defendants contend that their construction of the grant as conferring solely on Lot 1 the roadway easement over Lot 2 does not conflict with the grant's terms, for its intent was limited to

providing the owners of each lot with roadway access only to and from Sheridan Road and with access to utilities only from Sheridan Road. Thus, in their opinion, the only aspect of the 20-foot easement that is not merged is plaintiffs' necessary use of the easement across Lot 2 to reach the three-foot easement across Lot 1. This use, they maintain, "logically" is limited to the southernmost three feet of Lot 2 just as the grant locates the three-foot easement over Lot 1 in that lot's southernmost three feet. Defendants add that plaintiffs' literal reading of the easement grant renders it nonsensical, for under that interpretation, Lot 4 has an easement over itself, Lot 3 has an easement over itself, and so on, apparently not noticing that such easements would not have been created in the first place as a matter of law. Defendants also contend that any roadway use of the 20-foot easement would result in a dead-end road and thus should result in termination of that use, but we address only the issue of merger, which was the subject of the summary judgment order.

There should be little question about the standard of review for the grant or denial of a motion for summary judgment under section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005 (now 735 ILCS 5/2—1005 (West 1992))):

> "Although the use of summary judgment is encouraged as an aid in expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and should only be allowed when the right of the moving party is free from doubt. [Citation.] 'In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent.' [Citations.] In short, '[a] motion for summary judgment is to be decided on the basis of the record as it exists at the time the motion is heard.' [Citation.]
>
> Furthermore, it is well established that in deciding a motion for summary judgment, the court may draw inferences from the undisputed facts. However, where reasonable persons could draw divergent inferences from the undisputed facts, the issue should be decided by the trier of fact and the motion should be denied. [Citation.] In light of the standard, the trial court does not have any discretion in deciding the matter." (*Loyola Academy v. S&S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271-72, 586 N.E.2d 1211, 1215.)

Accordingly, the *de novo* standard of review applies (*In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 427, 589 N.E.2d 899, 903, *affirmed in part & vacated in part* (1993), 155 Ill. 2d 402, 615 N.E.2d 736), so "[t]he trial court's summary judgment may be affirmed on any basis appearing in the record whether or not the court relied on that basis

or its reasoning was correct." *Ray Dancer, Inc. v. DMC Corp.* (1992), 230 Ill. App. 3d 40, 50, 594 N.E.2d 1344, 1351.

■ On plaintiffs' motion for summary judgment on the affirmative defense of merger, their role was like that of a defendant, for they had no burden of proof. When one without the burden of proof moves for summary judgment, the burdened party need not satisfy its trial burden of a preponderance of the evidence to prevail (*Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 292-93, 560 N.E.2d 586, 589), but if confronted by affidavits and other evidence submitted by the movant, the burdened party must submit counteraffidavits. It may not rest solely on the allegations in its pleadings to raise an issue of fact that would thwart such a motion. (*Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 586, 272 N.E.2d 497, 500-01, *cert. denied* (1972), 408 U.S. 943, 33 L. Ed. 2d 766, 92 S. Ct. 2847; *East Side Fire Protection District v. City of Belleville* (1991), 221 Ill. App. 3d 654, 658, 582 N.E.2d 755, 758 ("Although a plaintiff is not required to prove his case on a defendant's motion for summary judgment, he must provide a factual basis arguably entitling him to judgment").) Thus,

> "where a party moving for summary judgment files supporting affidavits containing well-pleaded facts and the party opposing the motion files no counteraffidavits, the material facts set forth in the movant's affidavits stand as admitted. If the opponent fails to controvert the proofs offered in support of the motion and the movant's showing of uncontradicted facts would entitle him to judgment as a matter of law, then summary judgment is proper." *East Side Fire Protection District*, 221 Ill. App. 3d at 657, 582 N.E.2d at 758.

■ Keeping in mind that easements are defined by their uses and this court looks to the language of the instrument creating the easements and to contemporaneous circumstances to ascertain the intent of creation, it is plain that the grant of the 20-foot easement in Lots 4, 3, and 2 envisioned three uses: roadway, utilities, and sidewalk. Even though no one presented evidence at the summary judgment stage concerning the location of the utilities, defendants did not dispute that the utilities come only from Sheridan Road. Therefore, there exists no question of fact that there was any intent whatsoever to create a utility easement over Lot 2 for Lots 4 and 3. Needless to say, the application of the doctrine of merger results in extinguishment of Lot 1's easement over Lot 2 for this purpose.

Equally straightforward, but resulting in the opposite conclusion, is the question of the intent in creating the sidewalk easement over Lot 2 for Lots 3 and 4. Read in conjunction with the simultaneous grant of the three-foot easement across Lot 1 for lake access by the

owners of Lots 2, 3, and 4, there is little question that the intent when creating the sidewalk easement was to allow the owners of Lots 3 and 4 pedestrian access from Sheridan Road to the western edge of the three-foot easement as well as for Lot 1 to have pedestrian access to Sheridan Road. Thus, although Lot 2's use of sidewalk easement is extinguished under the merger doctrine, the sidewalk easement rights of Lots 3 and 4 remain. As for the sidewalk's location, we agree that it likely was intended to run along the south edge of Lot 2 to connect to the three-foot easement across Lot 1.

The intent in granting the easement for the roadway use presents a more complicated question: whether the easement across Lot 2 was intended only for Lot 1's ingress from and egress to Sheridan Road. In determining the purpose of that easement, we note that in *Delgado v. Wilson* (1989), 178 Ill. App. 3d 634, 533 N.E.2d 969, the court commented that a grant of an easement worded as "[a] right of way to be used as a driveway" did not include the right to park on the easement except to load and unload passengers. (178 Ill. App. 3d at 635.) Here the easement is for a "roadway," so its permitted uses are not limited to ingress and egress, but instead encompass activities such as parking, for an easement holder may park on an easement so long as doing so would not unreasonably interfere with the rights of the holder of the servient estate. (*Delgado*, 178 Ill. App. 3d at 641, 533 N.E.2d at 974 (Dunn, J., dissenting).) Furthermore, a road across Lot 2 would not create a dead end because the roadway here leads to the three-foot easement, so it could be used to bring vehicles closer to that easement for maintenance and the like. Moreover, the roadway easement grant here states that it is "to be enjoyed in common" and is not expressly limited to the use defendants urge, so we believe that only Lot 1's roadway easement rights across Lot 2 were extinguished by unity of title in Lots 1 and 2. Therefore, the easement rights of Lots 3 and 4 remain. This interpretation is in harmony with the general rule that an easement owner's rights are paramount to the extent to which it is necessary to carry out the purpose of the grant. *Schnuck Markets*, 213 Ill. App. 3d at 974, 572 N.E.2d at 1182.

In sum, from the plain meaning of the grant, the utility use of the 20-foot easement across Lot 2 was intended to benefit only the owner of Lot 1, but both the sidewalk and roadway uses of that easement were intended to benefit Lots 3 and 4 as well as Lot 1. We note that the grant does not locate or give the width of the sidewalk or the road and that the survey indicates numerous plantings within the 20-foot easement that would interfere with its use as a roadway, but some may predate the easement grant. Therefore, we remand to the circuit court, which in its role as fact finder is better equipped to

resolve these matters. *Joseph Giddan & Sons v. Northbrook Trust & Savings Bank* (1986), 151 Ill. App. 3d 537, 541, 501 N.E.2d 757, 760 (where deed does not define location of easement, court may set it), *appeal denied* (1987), 114 Ill. 2d 546, 508 N.E.2d 729.

## III

· In response to plaintiffs' motion for judgment in their favor after defendants concluded their case in chief, the circuit court found that removal of the wrought iron fence and gate on the south side of the house posed no threat to maintenance of the land and that the fence "wholly interfered with" plaintiffs' right of access to the lake. It ordered defendants to remove the fence and gate as well as any plantings they had placed within the limits of the three-foot easement.

In their challenge to this ruling, defendants recount Stotler's testimony about the security and safety concerns that prompted erection of the wrought iron fence. They claim their concerns are "validated" by plaintiffs' earlier installation of the chain link fence between the Park and the properties at issue and are permitted as a reasonable interference with the use of a private way at its terminus, citing *Green v. Goff* (1894), 153 Ill. 534, 536, 39 N.E. 975, 976 ("[t]he only limitations upon [a servient estate's owner] are such as are necessary to the proper use of the right of way"). They argue that the fence and gate were reasonable under the circumstances to enhance safety and privacy and avoid injury to unsuspecting trespassers who might fall down the bluff, and they further assert that any inconvenience to plaintiffs' use for lake access could be eliminated by giving them a key to the locked gate and ordering them to lock it after use. Defendants distinguish *Schaefer v. Burnstine* (1958), 13 Ill. 2d 464, 150 N.E.2d 113, in that there the gate's purpose and use had ceased, · so the advantage to the servient estate owner no longer existed although the inconvenience to the easement holder remained, unlike here where the gate's purpose remains. They distinguish *Nopolous v. McCullough* (1981), 95 Ill. App. 3d 852, 420 N.E.2d 734, on a similar ground (use of land for crops needed no gate, unlike former use for livestock) and stress that that case also concerned access problems for third parties with similar rights.

Section 2—1110 of the Code of Civil Procedure states as follows:

"In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered."

(Ill. Rev. Stat. 1991, ch. 110, par. 2—1110 (now 735 ILCS 5/2—1110 (West 1992)).)

In applying this statute,

> "[t]he trial court *** first must determine whether [the nonmovant, who had the burden of proof] has presented a *prima facie* case. If *** not, then the trial court should grant the motion and enter judgment in [the movant]'s favor. If [the burdened party] *has* set forth a *prima facie* case, the trial court then weighs the evidence. [Citations.] A trial court's determination on the motion will not be reversed on appeal unless the decision is contrary to the manifest weight of the evidence." *Zannini v. Reliance Insurance Co.* (1992), 147 Ill. 2d 437, 449, 590 N.E.2d 457, 462 (emphasis in original).

As explained by our supreme court in *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43, in all cases, jury and nonjury alike, a plaintiff must make out a *prima facie* case by presenting at least some evidence on every element essential to the cause of action. If the plaintiff fails to do this, the defendant is entitled to judgment as a matter of law. If the plaintiff does establish a *prima facie* case in a nonjury matter, however, the court then weighs the evidence. If this weighing results in negation of some of the evidence necessary to the plaintiff's *prima facie* case, the defendant is entitled to judgment. See also *Wehde v. Regional Transportation Authority* (1992), 237 Ill. App. 3d 664, 675-76, 604 N.E.2d 446, 455, *appeal denied* (1993), 149 Ill. 2d 662, 612 N.E.2d 525.

We first must disabuse defendants of their belief that installing the chain link fence between private property and public land is analogous to erecting this fence across plaintiffs' easement. The former was intended to prohibit access by people who had no right to be on the property, so its interference did not have to be "reasonable." As for the circuit court's finding that removal of the wrought iron fence posed no threat to "maintenance of the property," this observation addressed defendants' affirmative defense of the impossibility of use rather than the reasonableness of their interference with plaintiffs' use. Defendants do not argue that this ruling was against the manifest weight of the evidence, so we do not address it.

■ Our analysis of the question presented could begin (and end) with the general rule that "[an] owner of a right of way for ingress and egress has the right to use the full width *** unhampered by obstructions placed thereon" except for natural obstructions that existed at the time of the easement and were not placed there by the owner of the servient estate. (*Flower*, 135 Ill. App. 3d at 1040, 482

N.E.2d at 687.) The wrought iron fence lies across the 20-foot easement across Lot 2, and because the sidewalk and roadway uses of that easement have not been extinguished by merger, the fence must be removed so that the full width of that easement is unobstructed. Although defendants insist that the fence was a reasonable obstruction in light of the circumstances, the evidence on the need for the fence was, at best, conflicting, and it was greatly undermined by the evidence about the fence and unlocked gate on the north side of the house. Therefore, we cannot say that the circuit court's implicit finding that the fence unreasonably interfered with plaintiffs' use of the 20-foot easement was against the manifest weight of the evidence.[6]

■ As for defendants' insistence that the circuit court should have balanced the equities in this case, we are mindful that courts are free to decide whether to balance the equities when deciding whether to grant an injunction in a case of intentional or culpably negligent encroachment (*Borrowman v. Howland* (1983), 119 Ill. App. 3d 493, 502, 457 N.E.2d 103, 108). Here, the circuit court noted that under *LeClerq v. Zaia* (1975), 28 Ill. App. 3d 738, 328 N.E.2d 910, intentional interference would allow it to avoid the general rule that in deciding whether to grant injunctive relief, a court may compare the hardship to be suffered by one party against the benefit that would accrue to the other party. Because the intent in creating the three-foot easement was obviously to give the other three lots access to the lake, and because the evidence showed that defendants purposefully interfered with that use despite actual knowledge of plaintiffs' rights, the circuit court's decision not to take the equities of the matter into account was not an abuse of its discretion. Furthermore, most of the "equities" defendants raise are not relevant, such as plaintiffs' alternative access through the Park and defendants' creation of a pathway for plaintiffs on Park land, which have nothing to do with their right to use this easement on defendants' property, and plaintiffs' "creation" of the problem by locating the chain link fence on Park land, even though defendants admit knowing this prior to installing the plantings and the wrought iron fence.

---

[6]Even if the roadway use across Lot 2 had been merged, the sidewalk easement would remain, and the *Flower* court stated that a fence running the full width of an easement cannot stand. At a minimum, then, that portion of the fence crossing the sidewalk easement, in which there is no gate, would obstruct plaintiffs' use thereof and would have to be removed.

## IV

■ Defendants next contend that the circuit court's finding that the only issue to be resolved at trial was impossibility of use or failure in its original purpose was incorrect because there still remained questions concerning the nature of plaintiffs' permissible uses of the easements and whether defendants had impermissibly interfered with those uses. They do not explain why they are appealing this point; that is, they do not indicate what harm they suffered from this alleged error.

The circuit court's observation on the result of its ruling concerned only those issues presented by the motions but not yet decided. The motions addressed only the affirmative defenses. As the judge ruling on the motions stated, he decided only the issues presented by those motions. Thus, there remained the underlying complaint and counterclaim, so plaintiffs had to prove their case to obtain the relief they sought and could not have obtained judgment in their favor merely by blocking the affirmative defenses.

## V

■ Defendants also quarrel with the wording in the circuit court's order to the effect that "the evidence fails to show conclusively that the removal of the plants will cause erosion of the [three-foot] easement." They did not have this burden, they assert, apparently believing that plaintiffs had the burden of proving that removal of the plants would not cause erosion. This view, however, ignores the fact that impossibility of use, the issue for which this question was dispositive, was raised in their affirmative defenses and counterclaim for injunctive relief, so the burden of proof lay with them.

Defendants also insist that servient estate owners need not wait until an easement or adjacent property is damaged before requesting judicial intervention, citing *Flower*. They note that Collinson's testimony was that the bluff was highly vulnerable to failure, with the easement's slope the most vulnerable due to the gullying along the fence. They also focus on Stotler's testimony concerning his experience with slippage, failure, and repairs. Defendants assert that this unrebutted evidence established that foot traffic at the three-foot easement is a very real and serious threat to their property generally and to the easement in particular.

Defendants' error is that they misunderstand the necessary quantum of proof and do not recognize that they had to supply it on this issue. Although generally the "more probably true than not" standard applies in a civil trial, when asking for injunctive relief, as defendants did here, a party must present clear and convincing evidence, not just a preponderance. (*Chicago Title*, 384 Ill. at 84, 51

N.E.2d at 135 (deciding plaintiff's burden for enforcing an easement).) In addition, the issue for which evidence of erosion was presented was defendants' defense that removing the plantings obstructing plaintiffs' use would injure the easement area by encouraging erosion. The circuit court apparently decided that clearing the obstructing plants would be impermissibly harmful only if erosion were certain to occur after removal of the plants, for which defendants needed to present "conclusive" proof. Because defendants failed to demonstrate that removal of the plants will cause the erosion of the three-foot easement even if relocated or replaced, and because the evidence in fact did demonstrate that relocating the plantings would prevent erosion, defendants did not meet their burden of demonstrating with clear and convincing evidence that use of the three-foot easement and removing the plantings would cause erosion and thus qualify as the type of harm a dominant estate owner may not inflict. Therefore, the circuit court's conclusion that location of the plantings to allow plaintiffs to use the three-foot easement would not harm defendants' property was not against the manifest weight of the evidence.[7]

## VI

Defendants' final salvo is that plaintiffs did not demonstrate, and the court did not list, precisely which plantings obstruct their permitted uses of the easements, so the court's order to "remove any

---

[7]The dissent calls attention to our supposed conclusion "finding an absence of 'conclusive' proof that impermissible harm would occur should vegetation within the easement be removed." (264 Ill. App. 3d at 606.) This was the circuit court's word, not ours; the proper quantum of proof required is clear and convincing, as outlined above, and we analyzed the issue with this requirement in mind.

Further, the standard of review here, again as outlined above, is "against the manifest weight of the evidence"; that is, in order for this court to reverse the circuit court, we must determine that no rational trier of fact could have reached the conclusion that the circuit court did. This requires us to defer to the findings of the circuit court in most instances, which the dissent appears unwilling to do. For example, where the dissent claims that there was no testimony at trial to support the circuit court's finding that " 'most erosion of the land is caused by delayed action from the lake, rather than by foot traffic' " (264 Ill. App. 3d at 608), that finding is directly supported by Collinson's testimony on cross-examination and the reference to the Division of Water Resources pamphlet.

While we freely admit the possibility of reaching a different conclusion than that reached by the circuit court, unlike the dissent we are unable to state categorically that no rational trier of fact could have reached the circuit court's conclusion.

plantings placed by [defendants] in the easement which obstruct access to plaintiffs" and the concomitant permission to "replace the plantings they installed with other vegetation which will allow [plaintiffs] to traverse the easement" is not sufficiently clear to tell them what is forbidden or required, as mandatory injunction orders must do.

As noted above, the *Flower* court stated that "[a]n owner of a right of way for ingress and egress has the right to use the full width *** unhampered by obstructions placed thereon" except for natural obstructions that existed at the time of the easement and were not placed there by the owner of the servient estate. (*Flower*, 135 Ill. App. 3d at 1040, 482 N.E.2d at 687.) This general rule creates a presumption that anything in an easement will be considered an obstruction and thus may not remain, so defendants, not plaintiffs, had the burden of proving which plantings came under the exception to the general rule. Having conceded that they placed plantings in the easement, and having presented little evidence to demonstrate which ones they did not plant, defendants have little basis for challenging the order on this ground. In any event, the order appears sufficiently plain: if defendants cannot agree with plaintiffs on which ones they planted recently (the only ones the order requires them to remove), they may petition the circuit court for a hearing to modify the order, so that after hearing evidence, the court may determine the fate of each root.[8]

In sum, the circuit court correctly determined that there was no question of fact concerning the affirmative defense of merger of Lots 3 and 4's rights to use of the 20-foot easement, for the sidewalk and roadway uses, and plaintiffs were entitled to judgment as a matter of law on that issue. Similarly, the circuit court's order granting injunctive relief to plaintiffs in the form of a mandatory injunction to defendants to remove any plantings they themselves placed in the easement was not against the manifest weight of the evidence, and the order is sufficiently clear for performance. The portion of the order requiring removal of the entire wrought iron fence was proper because the court was not required to balance the equities, and even if it had they would have balanced in plaintiffs' favor, but we remand for the circuit court to determine the width and location of these uses within the 20-foot easement.

---

[8]Defendants' concern about plants other than the ones they themselves planted is mystifying, for the circuit court's order tells them to relocate only the plants they placed in the easement, not all the plants now in the easement. For example, defendants did not plant the privet hedge, so they do not have to remove it.

For the reasons stated above, we affirm the order of the circuit court but remand for additional proceedings.

Affirmed and remanded.

SCARIANO, J., concurs.

JUSTICE HARTMAN, dissenting:

I must respectfully dissent from the majority's conclusion finding an absence of "conclusive" proof that impermissible harm would occur should vegetation within the easement be removed, thereby causing further erosion and damage to the easement.

Dr. Charles Collinson, plaintiffs' expert, who was in charge of monitoring the condition of the Lake Michigan shoreline for the State of Illinois, testified concerning the vulnerable condition of the bluff on the Stotler property, property on which the easement is situated. This bluff is a seriously over-steepened grassy slope highly vulnerable to failure. Grass has very low stability on a steep slope along the Lake Michigan shoreline and there have been many cases of failure of such slopes, according to Dr. Collinson. The upper part of the slope is essentially without soil; sand is found right up in the grass roots. Sand showed through the top of the Stotler bluff; as far west as the Stotler veranda it is essentially sand, which is weak.

Five bore hole samples were taken on the Stotler property, as well as borings in Elder Lane Park. A report was prepared by Terra Testing, Inc., regarding the soil condition of the Stotler property, all admitted at trial. Dr. Collinson testified that there is a minimum of $5^1/2$ feet of sand in the uppermost layer right at the surface, and up to seven and nine feet of sand moving east toward the Stotler bluff, an essentially sand-filled slope, causing extremely unstable conditions. The borings, the Terra Testing Report, and the varying slopes between Elder Lane Park and the Stotler property indicate that the south side of the Stotler property, the easement side, is the wet side, making it even more vulnerable and less stable because of the increased water flow. He found signs of movement along the slope, making it inherently unstable and susceptible to becoming mobilized. He saw signs of additional movement in the same bluff area as late as 10 days prior to his testimony. From the Terra report he noted upper edge slope failure, which could be a predictor of continuing slope failures. He also noted an increasing gap in the sod during his investigation the day prior to his testimony.

Dr. Collinson noted from photographs in evidence erosion and sloughing of the bluff on the north side of Elder Lane Park where it

abuts the Stotler property, prior to the improvement in Elder Lane Park in 1987, which soil conditions have existed from 1974 to the present on the Stotler property immediately north of Elder Lane Park, and as have existed in Elder Lane Park. He noted the erosion on the properties north of the Stotler property depicted on one of the exhibits in evidence and explained that there had been a cave-in on the property immediately north of the Stotler property. This cave-in occurred at the south end of the adjoining property where it abuts the Stotler property; even today it has stability problems.

When Dr. Collinson examined the Stotler property the day prior to his testimony, the sod was slipping away again in the same area at least as far as the woody shrubs on the south side. In his opinion, the most vulnerable part of the slope on the Stotler property is the southern half of the lower slope, the area within the three-foot easement; this location is highly vulnerable to failure. He noted the gullying along the south fence line which had been progressing in the recent months prior to his testimony, and the area along the fence line being more steep, thereby contributing to this vulnerability.

It was Dr. Collinson's further opinion that the steepness of the slope along the south lot line of the Stotler property affects the stability of the bluff, stating: "If there's gullying there and failure and oversteepening, *** there would be an increase in gullying, greater susceptibility to damage from foot traffic, and we've seen that there has been a failure in that area in the lower slope in the past period. And the lower part of that area we can expect to be saturated before any other parts of the slope are saturated with water whenever we have rainy periods or wave oversplash. [Further,] *** this area of the slope is presently unstable [and is] *** highly vulnerable, and as I stated in private, I think that Mr. Stotler is living on the edge, [meaning] *** that he could experience major failures even today with his improvements at almost any time."

Dr. Collinson testified that the woody shrubs on the Stotler slope are beneficial to slope stabilization. In his opinion, "the grassy slope is highly vulnerable right now. It's oversteepened. It's badly supported. And if you remove the shrubs, then you would not only have an area that is as steep, but perhaps steeper, but it would be bare. No roots at all to retain it. It would be highly vulnerable to gullying, to foot traffic and failure. *** [I]t is highly inappropriate that there be any foot traffic there, [and would] be dangerous for the person walking down the slope [because] *** this is a very steep slope."

Dr. Collinson testified further that foot traffic also should be prohibited in Elder Lane Park, where the soil conditions are

substantially similar to the Stotler property, and that the fence installed by the Winnetka Park District is the type installed to prohibit foot traffic. The action taken by the Park District underscores the validity of the Stotlers' concern regarding their property.

On cross-examination, Dr. Collinson testified that during saturated conditions a handful of people walking down the Stotler slope in the area of the three-foot easement could result in serious consequences, particularly where the conditions are such that remedial action must be delayed, because further damage could ensue from the very remedial action itself. On re-cross-examination, Dr. Collinson testified that it would not take much foot traffic to cause a cavein. Another failure on the bluff in the area of the three-foot easement could very well affect a large area of the slope.

In my opinion, Dr. Collinson's uncontradicted testimony conclusively establishes that the Stotler property, and particularly the area within the three-foot easement, is highly vulnerable to failure. He testified that removal of the woody shrubs on the Stotler slope could cause severe damage to the Stotler property. Moreover, because many of these shrubs predate the Stotlers' ownership of their property, their removal is not mandated. Seymour testified that these shrubs block his ability to get to Lake Michigan through the three-foot easement.

In its memorandum opinion, the court stated as a conclusion of law, "Testimony at trial indicated that most erosion of the land is caused by delayed action from the lake, rather than by foot traffic." There was no testimony at trial to this effect. Dr. Collinson's testimony is that foot traffic causes a substantial hazard to the stability of the Stotler property as well as to persons traversing the property. His testimony, that wave action from the lake and other environmental factors cause slope instability, explains why foot traffic on the slope should not be allowed as adding to the instability of the slope and the hazards which exist for those who would use it.

Stotler testified that the north side of his property had been gullying badly all the way to the top of the bluff, becoming worse each time it rained; subsequently the whole top of the bluff slipped down. As the Elder Lane Park property was eroding, his property began shifting as well. He had seen his bluff caved in and dropped down substantially. Stotler explained that although there had been some gradual shifting, the greatest amount of damage happened in one day without any warning.

With regard to the remedial measures the Stotlers took to address the erosion problem, Stotler testified that they built a steel reinforced concrete wall by the stairs which was subsequently filled in with rock

and dirt. The Stotlers had the bluff rebuilt and installed a curbed wall of concrete blocks which an engineer designed to help the water drain off the bluff and to help support the bluff. The cost to install the wall and certain related remedial work was approximately $17,000 which the Stotlers paid themselves without any contribution from the Seymours. Stotler had an engineering study done of his property and borings drilled.

The stairs had been installed near the center of the lower bluff with concrete posts or pylons which help to keep the pressure of foot traffic off the surface of the bluff. Stotler explained that this was done to protect the bluff from further damage. The cost of installing the stairs was approximately $16,000. The cost to replace the stairs if there were another cave-in would be twice as much, over $30,000. The stairs he installed do not go straight vertically down the bluff but rather zigzag laterally across the bluff because the designing engineer advised that it would be too dangerous to install the steps straight down vertically and that the lateral design was required to distribute weight over a broader area. Stotler testified that he and his family do not walk down the bluff other than on the stairs to prevent destroying the bluff and because it would be dangerous to the person walking. Prior to installing the stairs, he often fell and slipped when he walked down the bluff. Over time, there was shifting and damage to the bluff from foot traffic. Notwithstanding the remedial action the Stotlers have taken, there has been continuing erosion, including areas which have shifted and where the underlying clay or sand can be seen. Approximately six months after he installed the concrete wall, the bluff began to shift and was even worse as of the time of his testimony.

An easement granted for a particular purpose terminates when such purpose ceases to exist, is abandoned, or is rendered impossible of accomplishment. (*URS Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 236, 427 N.E.2d 1295, 1300.) The circuit court's conclusion that harm must be demonstrated "conclusively" *after* removal from the easement of the plants and shrubbery within the easement flies in the face of common sense and the law. As Dr. Collinson testified, it is wrong to assume that adverse impact, no matter what it is, can be ameliorated through maintenance without potentially causing additional damage. As the court in *Flower v. Valentine* has noted, "[i]t is evident that the plaintiff was not obligated under the law to wait until the easement area or property off of the easement was damaged or destroyed before she brought an action to enjoin the actions of defendants." (*Flower*, 135 Ill. App. 3d at 1044, 482 N.E.2d at 690.) The clear, convincing and unrebutted evidence at trial

established that foot traffic in the area of the easements poses very real and serious threats to the already vulnerable condition of the Stotler property, both within the area of the easements and beyond, as well as to persons traversing the Stotler bluff. Accordingly, under the doctrine of failure of purpose, the easements should be extinguished since the purpose for which they were created, safe access by the Seymours to the waters of Lake Michigan without harm to the easement property, has failed. The circuit court's conclusion to the contrary is against the manifest weight of the evidence and should be reversed.