THIRD DIVISION
MAY 28, 2008

Nos. 1-07-2782, 1-07-3076 consolidated

| | | |
|---|---|---|
| GENESCO, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CH 12660 |
| | ) | |
| 33 NORTH LASALLE PARTNERS, L.P., | ) | The Honorable |
| | ) | Nancy J. Arnold, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Genesco, Inc., appeals from the order of the circuit court granting summary judgment in favor of defendant 33 North LaSalle Partners, L.P. In so doing, the circuit court determined that plaintiff failed to comply with the terms of the parties' lease termination option and further concluded that plaintiff was not entitled to equitable relief. On appeal, plaintiff contends that, despite its failure to strictly comply with the lease termination requirements, the circuit court erred in failing to grant equitable relief where plaintiff gave timely, oral notice; plaintiff's noncompliance was trivial and not intentional; plaintiff will suffer undue hardship as a result of the court's order; and defendant has not suffered harm as a result of plaintiff's noncompliance.

The underlying facts are not in dispute. In June 2004, plaintiff entered into a sublease, which expired on February 28, 2008, with Credit Suisse First Boston, USA, Inc. (Credit Suisse), for retail space located at 33 North LaSalle Street, Chicago, Illinois. At that time, the retail and office building housing the space at issue was owned by Thirty-Three Associates, LLC

1-07-2782, 1-07-3076 (cons.)

(Associates). Accordingly, the sublease defined Credit Suisse as plaintiff's "Landlord" and Associates as plaintiff's "Overlandlord."

Simultaneous therewith, plaintiff entered a prospective six-year lease with Associates commencing upon the expiration of the sublease. According to its terms, plaintiff was required to operate a Johnston & Murphy men's shoe store and was prohibited from assigning or subletting the space without prior written consent from the landlord. The "Landlord," however, could not unreasonably withhold, delay or condition its consent to assign or sublet, so long as the intended use of the space remained a "high-end, full price" retail establishment, excluding food and clothing stores and travel agencies. The base rent for the life of the lease totaled approximately $800,000.

The lease further provided plaintiff with an option to terminate, the subject of which forms the basis of this appeal. In order to exercise the termination option, plaintiff was required to provide written notice to the "Landlord" no later than February 28, 2007 and simultaneously pay $7,500 of the $30,000 termination fee, "time being of the essence." In a separate provision, the lease detailed the notice requirements, such that notice would be "deemed given and delivered, whether or not received, on the date when personally delivered by overnight courier service *** or two days following the date when deposited in the United States Mail *** and properly addressed"as instructed, "To Landord: c/o Golub & Company, Suite 2000, 625 North Michigan Avenue, Chicago, Illinois 60611, Attention: Vice President/Commercial Properties, or such other address as Landlord shall designate by written notice."

Plaintiff additionally entered an agreement with Credit Suisse and Associates regarding

-2-

the sublease. This related agreement expressly provided Associates' consent for the sublease and referenced plaintiff and Associates' prospective lease. In addition, the related agreement noted that plaintiff could exercise a termination option provided it gave written notice to the "Landlord," where "Landlord" was not defined.

According to defendant, on July 30, 2004, it purchased 33 North LaSalle building and succeeded Associates as landlord under the lease. Defendant, however, did not notify plaintiff of its succession in interest before February 27, 2008, the closing date of plaintiff's termination option. As a result, defendant agreed, by way of stipulation, that it would not argue that notice sent to Associates was defective.

In late January 2007, plaintiff's agent and defendant's agent attempted to renegotiate the base rent rate. At that time, plaintiff's agent orally informed defendant's agent that plaintiff would exercise its termination option if the negotiations proved unsuccessful. Then, on February 27, 2007, plaintiff's agent orally notified defendant's agent that plaintiff wished to exercise the termination option and that written notice indicating such along with the termination fee was forthcoming. On February 27, 2007, plaintiff erroneously sent notice and a check for $7,500 to Credit Suisse and copied the notice to Associates, care of Golub & Company, at 625 N. Michigan Avenue, Suite 200 instead of Suite 2000. On March 7, 2007, Credit Suisse returned the check and, in response, plaintiff contacted Golub & Company to determine where to direct the termination fee and to obtain a W-9 tax form. Plaintiff subsequently received a W-9 tax form via facsimile from Mainland Properties and therefore issued a second check payable to both Associates and Mainland Properties at the corresponding address on the facsimile. Associates

1-07-2782, 1-07-3076 (cons.)

later returned the check. As a result, plaintiff filed a claim for declaratory judgment and both parties filed cross-motions for summary judgment. This timely appeal follows the circuit court's order granting summary judgment in favor of defendant.

Summary judgment should be granted only if the pleadings, depositions, admissions and affidavits, construed liberally and in favor of the nonmoving party, demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2006); Thomson Learning, Inc. v. Olympia Properties, LLC, 365 Ill. App. 3d 621, 626 (2006). We review the trial court's legal decisions *de novo*. Thomson Learning, Inc., 365 Ill. App. 3d at 627. However, to the extent that the trial court exercised its discretion in determining that equitable relief was not proper, we believe that the trial court's decision is entitled to deference and will consider it for an abuse of discretion. See Seymour v. Harris Trust & Savings Bank of Chicago, 264 Ill. App. 3d 583, 595, 604 (1994) (although the court reviewed *de novo* the trial court's order granting summary judgment, the issue of whether the trial court properly exercised its equitable powers in deciding whether to grant injunctive relief was reviewed for an abuse of discretion); see also Krusinksi Construction Co. v. Northbrook Property & Casualty Insurance Co., 326 Ill. App. 3d 210, 218 (2001) (whether to grant apportionment was an equity matter to be reviewed for an abuse of discretion).

In a seminal decision, the supreme court announced the general rule that a lessee must strictly comply with the terms of an option to extend a lease. Dikeman v. Sunday Creek Coal Co., 184 Ill. 546, 550-51 (1900). Over 100 years ago, the Dikeman court stated:

"In a court of law the time for the performance of an act is as essential as any other part of

-4-

the contract. The time passed, and, not having been waived, the option was lost, so that there could be no defense made in the action at law. Equity maintains a somewhat different rule, - that time is not necessarily of the essence of a contract; and if it is not of the essence of an agreement, and a party has acted in good faith in a meritorious cause, equity may grant relief. Parties have a right, however, to make their own contracts, and, if they intend that time shall be of the essence of the contract, either by the express form of their agreement or because the subject matter makes it so, a court of equity will treat it as of the essence and hold the parties to their agreement. A court of equity is bound by a contract as the parties have made it, and has no authority to substitute for it another and different agreement, and particular language is not necessary to make the time of performance essential, if right and justice in the individual case demand it. An agreement must be complied with as made unless some stipulation is waived or there is a just excuse for non-compliance." Dikeman, 184 Ill. at 550-51.

Courts have since additionally applied that general rule to require strict compliance with an option to terminate a lease. See Thomson Learning, Inc., 365 Ill. App. 3d at 627; see also Gold Standard Enterprises, Inc. v. United Investors Management Co., 182 Ill. App. 3d 840, 844 (1989). The rationale behind the rule is that a lessee should be strictly held to the agreed-upon terms of the parties' contract where the parties to commercial leases are generally sophisticated and the lessor typically receives no consideration for agreeing to the option. Thomson Learning, Inc., 365 Ill. App. 3d at 629-30; Linn Corp. v. LaSalle National Bank, 98 Ill. App. 3d 480, 484 (1981).

1-07-2782, 1-07-3076 (cons.)

In the case at bar, there is no question that plaintiff failed to strictly comply with the termination option. In order to exercise that option, plaintiff was required to mail its written notice to the designated landlord along with a portion of the termination fee at least two days prior to February 28, 2007. Plaintiff concedes that written notice was not mailed until February 27, 2007 and the termination fee was improperly executed. The parties' termination option expressly provided that time was of the essence and courts are bound to interpret the contract as written. See Dikeman, 184 Ill. at 550-51. Accordingly, plaintiff failed to exercise the termination option.

Plaintiff, however, contends that its failure should be excused where it provided timely, oral notice of its intent to exercise the termination option. According to plaintiff, because its agent verbally notified defendant's agent of its intent one day prior to the date written notice was due, it substantively complied with the notice requirement. We decline plaintiff's invitation to adopt a *per se* actual notice rule and find no reason to treat cancellation options different than extension options; instead, we agree with the trial court and the Thomson Learning, Inc. court that actual, verbal notice "is just another way of highlighting Tenant's failure to strictly comply with the Cancellation Option." Thomson Learning, Inc., 365 Ill. App. 3d at 633; *cf*. Vole, Inc. v. Georgacopoulos, 181 Ill. App. 3d 1012, 1019 (1989) (where court held that, in the context of a lease violation, timely written notice was sufficient despite a technical error that it was not sent via registered mail).

Nevertheless, plaintiff contends that this court should exercise its equitable powers to excuse plaintiff's noncompliance based on the fact that plaintiff provided actual, oral notice; its

-6-

1-07-2782, 1-07-3076 (cons.)

mistake was trivial; its noncompliance was not intentional, but rather negligent; it will suffer

serious harm if not excused from the lease; and defendant was not harmed by plaintiff's

noncompliance.

As previously stated, the supreme court in <u>Dikeman</u> explained that "[a]n agreement must

be complied with as made unless some stipulation is waived or there is just excuse for non-

compliance." <u>Dikeman</u>, 184 Ill. at 551. A number of courts have since interpreted <u>Dikeman</u> to

mean that a court may exercise its equitable powers to excuse strict performance of an extension

or termination option. We are troubled by the fact that these cases extending and applying the

narrow, express language offered in <u>Dikeman</u> offer no basis in law upon which courts are

purportedly empowered with a blanket ability to provide equitable relief. See <u>Gold Standard</u>

<u>Enterprises, Inc.</u>, 182 Ill. App. 3d at 845 (relying on <u>Dikeman</u> and a concoction of secondary

sources, namely, 30 C.J.S. *Equity* 546 (1965); 3 J. Pomeroy, Equity Jurisprudence §§823, 824

(5th ed. 1941); and 7 Ill. L. & Prac. *Chancery* §55 (1954)*,* to support the proposition that equity

may relieve strict performance where failure to comply is an "accident"); <u>Ceres Terminals Inc. v.</u>

<u>Chicago City Bank & Trust Co.</u>, 117 Ill. App. 3d 399, 405 (1983) (comparing the facts of that

case to those in <u>Dikeman</u> and <u>Linn Corp.</u> to presumptively determine that the plaintiff had "not

established the degree of special circumstances necessary to warrant equitable relief");

<u>Providence Insurance Co. v. La Salle National Bank</u>, 118 Ill. App. 3d 720, 723-24 (1983) (solely

relying on <u>Linn Corp.</u> and <u>Dikeman</u> to presumptively conclude that, where the facts were "even

stronger" than <u>Linn Corp.</u>, the court could excuse strict performance); <u>Linn Corp.</u>, 98 Ill. App. 3d

at 483-84 (distinguishing <u>Dikeman</u> and finding support in cases outside the jurisdiction to

presumptively conclude that a court could exercise "its equitable powers" to excuse strict compliance). These cases provide an unsupported theory of equitable power and, relying thereupon, plaintiff conclusively states that we have the inherent authority to grant relief when it is "fair and just." None of these cases, however, recognize that <u>Dikeman</u>, sitting at a time when courts of equity existed, stated that equitable relief may only be granted where time is not of the essence in the agreement and "a party has acted in good faith in a meritorious cause." <u>Dikeman</u>, 184 Ill. at 550. Therefore, even assuming, *arguendo*, we had the power to grant equitable relief in any and all cases, according to <u>Dikeman</u>, the instant case would not be afforded such relief where the parties' termination option clearly stated that time was of the essence. Moreover, the instant case suffers from the same malady as that dismissed by the court in <u>Dikeman</u>, in that:

"[t]here was no fraud, accident, or mistake on account of which complainant neglected to avail itself of the option, and it assigns no explanation or excuse for the delay except the negligence of its own agent. It lost its legal right by failing to comply with the condition precedent, and we do not see how equity can relieve against mere forgetfulness." <u>Dikeman</u>, 184 Ill. at 551.

Notwithstanding, the only case cited which provides recognizable support for the ability to grant equitable relief and a test for when equitable relief is proper is <u>Thomson Learning, Inc</u>. In <u>Thomson Learning, Inc.</u>, the Second District provided:

"To be entitled to equitable relief, a lessee that fails to strictly comply with an option to cancel or extend a commercial lease must at a minimum establish: (1) the delay in strictly complying was slight; (2) the lessee would suffer undue hardship if strict

1-07-2782, 1-07-3076 (cons.)

compliance were not excused; and (3) the lessor would not suffer prejudice if strict compliance were excused." Thomson Learning, Inc., 365 Ill. App. 3d at 633, citing 1 J. Perillo, Corbin on Contracts §2.15, at 203 (rev. ed. 1993).

Consequently, despite our concerns, we analyze whether the trial court may have provided "equitable relief" for plaintiff's failure to strictly comply with the terms of the termination provision pursuant to the Thomson Learning, Inc. test.

Primarily, we conclude that plaintiff's errors do not rise to the level of "just excuse" as initially stated in Dikeman and applied in various forms in its progeny. Unlike the lessees in Providence Insurance Co. and Gold Standard, the instant plaintiff cannot demonstrate that its noncompliance resulted from its minor carelessness or negligence in combination with that of another. In Providence Insurance Co., the lessee mailed the requisite written notice two days prior to the final option date, which fell on a Saturday, yet the lessor did not actually pick up the notice from the post office until the following Monday.[1] Providence Insurance Co., 118 Ill. App. 3d at 722. There, the trial court excused the lessee's strict noncompliance on the basis that there was no way to know the precise day on which the notice was deposited in the lessor's post office box and the one-day delay did not harm the lessor in any manner. Providence Insurance Co., 118 Ill. App. 3d at 723-24.

Morever, in Gold Standard, the lessee mailed the requisite notice several days prior to the due date and it was delivered the next day; however, the postage affixed by the lessee was

[1]The lease provided that service was considered complete five days after mailing or upon receipt, whichever was earlier. Providence Insurance Co., 118 Ill. App. 3d at 722.

1-07-2782, 1-07-3076 (cons.)

insufficient and thus the lessor never formally received the notice. Gold Standard, 182 Ill. App. 3d at 845-46. The Gold Standard court excused the lessee's noncompliance as an accident on the basis that the lessee had sent previous letters with the same postage and they were received without incident. Gold Standard, 182 Ill. App. 3d at 846 (in making its determination, the court additionally considered the fact that the lessor was not harmed by the delay).

Contrarily, in the case at bar, plaintiff solely made a series of errors resulting in the initial delay, which were then exacerbated in its attempted cure. More specifically, plaintiff's agent failed to contact its legal advisors in executing the termination option and compounded that error by failing to read the parties' lease. Instead, resting on unrelated experience, plaintiff's agent mailed the notice one day prior to its due date, instead of two days prior as required by the agreed terms of the lease. Moreover, plaintiff's agent mailed the notice and executed the lease termination fee to the landlord under the sublease as opposed to the landlord named in the parties' lease. Plaintiff attempts to justify this error by averring that a copy of the notice was sent to defendant's predecessor in interest, Associates, and that its agent was confused regarding the appropriate landlord because of the language in the parties' related agreement referencing the termination option in the lease. We are not persuaded. The fact remains that plaintiff was exercising an option under the lease; therefore, any confusion regarding the appropriate steps necessary to exercise that option should have been resolved by consulting the actual lease, which plaintiff's agent admittedly did not do despite the fact that she directly quoted the language of the lease's termination option in the prepared notice.

Further compounding its errors, when Credit Suisse returned plaintiff's check for the

-10-

termination fee, plaintiff's agent contacted defendant's property manager at a different location to ascertain the appropriate name and address of the landlord. The property manager subsequently sent plaintiff a requested tax document via facsimile and plaintiff assumed that the corresponding address was the appropriate landlord. Again we cannot excuse plaintiff's failure to consult the actual lease to resolve any confusion. Accordingly, although defendant was given oral notice within the prescribed time period, plaintiff has not demonstrated that its subsequent carelessness or negligence in attempting to comply with the terms of the lease should be justly excused.

Plaintiff further argues that this court should equitably excuse its noncompliance because it will suffer undue hardship if the lease remains in effect. Primarily, plaintiff attempts to convince this court that it will suffer losses of over $1 million if the lease is not forfeited. Simply stated, plaintiff is incorrect because, to endure such a loss, plaintiff would be required to lease the premises at issue for the life of the lease and presumes that plaintiff would continue to operate the store with the expected earnings' loss. Plaintiff, however, fails to acknowledge the fact that it could breach the lease and abandon the store, thereby forcing defendant to mitigate its damages. See 735 ILCS 5/9-213.1 (West 2006). In that situation, plaintiff's potential loss could not exceed the balance of the agreed rent for the lease, namely, approximately $800,000.

Still more appealing, plaintiff could attempt to sublease or assign the lease to another party so long as it complied with the relevant terms of the lease, namely, finding a high-end, nonfood, nonclothing or nontravel agent retail tenant. Plaintiff's attempt to argue that a subtenant or assignee would be required to operate a Johnston & Murphy shoe store is plainly inaccurate where the terms of the lease require *plaintiff* to operate that business, yet provides

parameters for potential subtenants or assignees.

We are further not convinced by plaintiff's argument that no action would eliminate its undue hardship because the rent for the leased space was well above market. Plaintiff is a sophisticated commercial retail lessee that negotiated and agreed with the terms of the lease. The fact that it gambled on the market and entered the lease four years prior to its commencement is not a basis upon which we will grant equitable relief simply because plaintiff lost its gamble.

Plaintiff's purported hardship is distinguishable from the "special circumstances" resulting in equitable relief in Linn. In granting relief despite the lessee's failure to strictly comply with the terms of a renewal option, the Linn court heavily relied on the fact that the lease required the lessee to make substantial improvements to the subject property in exchange for the option. Linn, 98 Ill. App. 3d at 483-84. The Linn court distinguished its facts from those in Dikeman on the basis that they did "not present the kind of case in which the option to renew [was] merely a privilege with no corresponding right or privilege of the lessor." Linn, 98 Ill. App. 3d at 484. Rather, the lessors in Linn "allegedly received an extremely valuable consideration for granting the options - the right to have the improvements made and the right to keep all such improvements at the conclusion of the lease term or any extension thereof." Linn, 98 Ill. App. 3d at 484.

In the case at bar, plaintiff cannot demonstrate that it will suffer undue hardship as a result of "valuable consideration" given to defendant in exchange for providing the termination option. We are not persuaded by plaintiff's attempt to compare the $30,000 termination fee required under the parties' lease to the $200,000 in property improvements made by the lessee in

1-07-2782, 1-07-3076 (cons.)

Linn. In addition to the fact that the termination fee does not equate to "valuable consideration" in our opinion, the situations are vastly different in that the instant plaintiff was charged that fee presumably for the convenience of opting out of a six-year lease and requiring defendant to take all the necessary steps to find a tenant to fulfill that vacancy, whereas the lessee in Linn was required to make substantial improvements to the leased space while only benefitting from those improvements for approximately two years. Linn, 98 Ill. App. 3d at 484. Instead, the instant case more closely resembles the facts of Ceres Terminals, Inc., where the court concluded that any losses suffered by the lessee represented "nothing more than normal business costs which could be alleged as losses by any lessee who has failed to exercise properly a lease option." Ceres Terminals, Inc., 117 Ill. App. 3d at 405. Accordingly, we conclude that plaintiff failed to establish that it should be equitably excused from failing to strictly comply with the terms of the termination option because it will endure undue hardship.

Finally, we are not persuaded by plaintiff's argument that equitable relief is proper where defendant did not suffer harm as a result of the delayed notice. Based on the fact that defendant has not established just excuse or undue hardship, we need not consider whether defendant would suffer prejudice if we provided equitable relief. Thomson Learning, Inc., 365 Ill. App. 3d at 633 (a lessee must minimally establish all three requirements to be entitled to equitable relief). Rather, "it is plaintiff's burden to establish the degree of special circumstances necessary to invoke the equitable powers of the court before any balancing of equities occurs." Ceres Terminals, Inc., 117 Ill. App. 3d at 406.

Accordingly, we affirm the judgment of the circuit court of Cook County.

-13-

1-07-2782 & 1-07-3076 cons.

Affirmed.

QUINN, P.J. concurs.

THEIS, J. specially concurs.

JUSTICE THEIS, specially concurring:

In this case, the majority finds that equity should not excuse plaintiff from strict compliance with the terms of the termination option of its lease. I agree with the majority=s reasoning and holding, but write separately to explain the equitable relief that plaintiff requests. I will also explain why these equitable principles do not aid plaintiff in this case.

It is well settled that a court may exercise its equitable powers to relieve a party of strict compliance with the requirements of exercising an option in a lease agreement where there has been an unavoidable accident, fraud, surprise, or mistake. 2 J. Pomeroy, Equity Jurisprudence ' 451, at 283; ' 453b, at 296-97 (5th ed. 1941); F.B. Fountain Co. v. Stein, 97 Conn. 619, 624, 118 A. 47, 49 (1922); see also Dikeman v. Sunday Creek Coal Co., 184 Ill. 546, 551, 56 N.E.864, 865 (1900). For example, a court would exercise its equitable powers to relieve strict compliance where a party has made an honest effort to comply with the requirements of a contract and there was a miscarriage of the mail. See 2 J. Pomeroy, Equity Jurisprudence ' 453, at 292 (5th ed. 1941) (discussing mistake and accident in the context of forfeitures arising from the failure to pay rent); see also Gold Standard Enterprises, Inc. v. United Investors Management Co., 182 Ill. App. 3d 840, 845-46, 538 N.E.2d 636, 639-40 (1989) (post office failed to deliver letter because, unbeknownst to party mailing letter to exercise option, it lacked sufficient

-14-

1-07-2782 & 1-07-3076 cons.

postage); <u>Providence Insurance Co. v. La Salle National Bank</u>, 118 Ill. App. 3d 720, 723, 455 N.E.2d 238, 240-41 (1983) (although letter may have been in lessor=s post office box on the Saturday due date, the lessor did not pick up the letter from the post office box until Monday, which was first business day following the due date).

It is also well-settled that a court will not exercise its equitable powers to relieve a party of gross or willful negligence in failing to timely and properly exercise an option to renew or terminate a lease. 2 J. Pomeroy, Equity Jurisprudence ' 453b, at 296-97 (5th ed. 1941); <u>F.B. Fountain</u>, 97 Conn. at 624, 118 A. at 49. However, jurisdictions across the country are split over whether a court may exercise its equitable powers to relieve a party=s mere carelessness, forgetfulness, or ordinary negligence in failing to properly exercise an option. <u>Thomson Learning, Inc. v. Olympia Properties, LLC</u>, 365 Ill. App. 3d 621, 633 n.4, 850 N.E.2d 314, 325 n.4 (2006) (and cases cited therein); <u>Andrews v. Blake</u>, 205 Ariz. 236, 244-45, 69 P.3d 7, 15-16 nn 4-5 (2003) (and cases cited therein).

More than 100 years ago, in <u>Dikeman v. Sunday Creek Coal Co.</u>, 184 Ill. 546, 551, 56 N.E.864, 865 (1900), our supreme court held that a court must enforce an agreement as written unless Asome stipulation [has been] waived or there is a just excuse for non-compliance.@ The court then went on to explain that in that case, there was no Afraud, accident or mistake on account of which complainant neglected to avail itself of the option, and it assign[ed] no explanation or excuse for the delay except the negligence of its own agent.@ <u>Dikeman</u>, 184 Ill. at 551, 56 N.E.2d at 865. Absent a Ajust excuse@ such as Afraud, accident, or mistake,@ the court thus declined to exercise its equitable powers to Arelieve against mere forgetfulness.@ <u>Dikeman</u>,

-15-

1-07-2782 & 1-07-3076 cons.

184 Ill. at 551, 56 N.E.2d at 865; see also Moore v. Kriebel, 742 So. 2d 139, 145-46 (Miss. App. 1999) (interpreting and relying upon Dikeman to reach this same holding). Thus, Illinois sided with those jurisdictions maintaining that equity will never relieve Amere negligence as by forgetfulness@ in failing to timely and properly exercise an option in a lease agreement. See F.B. Fountain, 97 Conn. at 625, 118 A. at 49; see also Thomson Learning, 365 Ill. App. 3d at 633 n.4, 850 N.E.2d at 325 n.4 (and cases cited therein).

However, numerous other jurisdictions have relied on the equitable maxim that Aequity abhors forfeiture@ to reach a different result. 15 R. Lord, Williston on Contracts ' 46.11, at 437-38 (4th ed. 2000); see also Andrews, 205 Ariz. at 244-45, 69 P.3d at 16 n.4 (citing cases from jurisdictions allowing equitable interventions for negligent or inadvertent failures to strictly comply with the terms of an option). The rationale behind this position is that equity abhors forfeiture so much so that equity would allow a party time beyond the time established by a contract to perform in order to save that party from an egregious forfeiture. 15 R. Lord, Williston on Contracts ' 46.11, at 437-38 (4th ed. 2000). However, not all potential forfeitures warrant equitable relief. 15 R. Lord, Williston on Contracts ' 46.11, at 439-41 (4th ed. 2000). To determine what degree of forfeiture would prompt a court to equitably intervene, the court must weigh the delay and culpability of the delaying party against the degree of the potential forfeiture. 15 R. Lord, Williston on Contracts ' 46.11, at 440-41 (4th ed. 2000). Where there has been no forfeiture, equity may also act to prevent another unconscionable result. 1 J. Perillo, Corbin on Contracts ' 2.15, at 202 (1993).

Courts across the country have applied a three-part test to determine when equity should

relieve strict compliance in order to prevent a forfeiture or other unconscionable result. 15 R. Lord, Williston on Contracts ' 46.12, at 461-62 (4th ed. 2000); 1 J. Perillo, Corbin on Contracts ' 2.15, at 203 (1993). According to Corbin on Contracts, strict compliance with the terms of the option may be excused where: (1) the delay in notice was slight; (2) the delay did not prejudice the other party by a change in position; and (3) the failure to grant relief would result in such hardship as to make literal enforcement of the renewal provision unconscionable. 1 J. Perillo, Corbin on Contracts ' 2.15, at 203 (1993). The Corbin test was first articulated in F.B. Fountain, 97 Conn. At 627, 118 A. at 50. The court in F.B. Fountain explained that this test applied where a party was neglectful, but not willfully or grossly negligent. F.B. Fountain, 97 Conn. at 627, 118 A. at 50. Further, the court in F.B. Fountain explained that the three-part test does not apply where an independent ground for equity to relieve a party of strict compliance exists, such as accident, fraud, surprise, or mistake Afree from culpable negligence.@ F.B. Fountain, 97 Conn. at 626, 118 A. at 49-50.

Other variations of this three-part test also exist. The Second District of this court in Thomson Learing applied a variation of the Corbin test, which the majority applies here. Thomson Learning, 365 Ill. App. 3d at 633, 850 N.E.2d at 324. Williston on Contracts articulates yet another version of the test, under which the late exercise of an option may be excused where: (1) the failure is caused by inadvertence or oversight; (2) the other party has not substantially changed position in reliance on the failure to timely exercise the option; and (3) the application of the general rule that time is of the essence would work an unconscionable result or a forfeiture. 15 R. Lord, Williston on Contracts ' 46.12, at 461-62 (4th ed. 2000).

1-07-2782 & 1-07-3076 cons.

Although our supreme court has never overruled its holding in Dikeman, this court in Linn Corp. v. LaSalle National Bank, 98 Ill. App. 3d 480, 424 N.E.2d 676 (1981), reversed the grant of a motion to dismiss, finding that the circuit court could exercise its equitable powers to relieve a party=s negligent failure to properly exercise an option based on the factors in the three-part test. There, the court found that strict compliance with a one-year written notice to renew requirement could be excused where strict enforcement would have resulted in the forfeiture of some $200,000 worth of improvements to a premises and where the failure to exercise strict compliance did not cause the lessor any undue hardship because the lessee had orally notified the lessor of the intention to renew before the deadline. Linn, 98 Ill. App. 3d at 484, 424 N.E.2d at 679. In so holding, the Linn court erroneously cited Dikeman for the proposition that it could simply excuse strict compliance with the terms of an option where Aright and justice@ so require. Linn, 98 Ill. App. 3d at 483, 424 N.E.2d at 678. The Linn court failed to recognize that what Dikeman considered to be Ajust excuse for noncompliance@ included only fraud, accident, or non-negligent mistake, which are traditional grounds for equitable intervention. Dikeman, 184 Ill. at 551, 56 N.E. at 865; F.B. Fountain, 97 Conn. at 624, 118 A. at 49; see also 2 J. Pomeroy, Equity Jurisprudence ' 453b, at 296 (5th ed. 1941).

Since Linn, the Illinois Appellate Court has continued to use the three-part test in determining whether to excuse strict compliance with the terms of an option. See, e.g., Thomson Learning, 365 Ill. App. 3d at 633, 850 N.E.2d at 324; Ceres Terminals, Inc. v. Chicago City Bank & Trust Co., 117 Ill. App. 3d 399, 404-05, 453 N.E.2d 735, 738 (1983); see also Providence Insurance, 118 Ill. App. 3d at 723, 455 N.E.2d at 240 (not applying the three-part test, but citing

-18-

<u>Linn</u> for the proposition that strict compliance may be excused under Aproper circumstances@ even where the failure to provide the stipulated notice is due solely to the lessee=s negligence). There has been no Illinois Supreme Court decision on this point since <u>Dikeman</u>. Thus, the holding of <u>Dikeman</u>, that Illinois courts will never exercise their equitable powers to relieve negligent or careless failures to timely and properly comply with the terms of an option, is still the law.

Here, plaintiff concedes that it negligently failed to properly exercise its option to terminate the lease in question. Further, plaintiff has not asserted a traditional grounds for equitable relief, such as fraud, mistake, duress, or accident. Therefore, because <u>Dikeman</u> is still the law, the court should not excuse plaintiff=s negligent noncompliance.

However, even if the three-part test were adopted, I would reach the same conclusion. Under either the Williston or Corbin version of the three-part test, it is clear that there must be a risk of forfeiture or other unconscionable result before the court will relieve a party of strict compliance. 15 R. Lord, Williston on Contracts ' 46.12, at 461-62 (4th ed. 2000); 1 J. Perillo, Corbin on Contracts ' 2.15, at 203 (1993). Consistent with this requirement, this court in <u>Ceres Terminals</u>, 117 Ill. App. 3d at 405, 453 N.E.2d at 738, did not excuse a party=s failure to timely exercise an option where that party would have suffered nothing more than normal business costs as a result of its failure.

Here, plaintiff has not claimed that it will suffer a forfeiture or other unconscionable result if strict compliance were not excused. Rather, as in <u>Ceres Terminals</u>, plaintiff will only suffer the normal business costs that would be suffered by any lessee that has failed to properly

1-07-2782 & 1-07-3076 cons.

exercise a lease option.  See <u>Ceres Terminals</u>, 117 Ill. App. 3d at 405, 453 N.E.2d at 739.

Therefore, under either the Williston or Corbin version of the three-part test, plaintiff should not

be relieved of strict compliance with the requirements of the option contract.  Accordingly, I

agree with the majority=s conclusion affirming the judgment of the circuit court.